MISSION IOWA WIND CO., and
Storm Lake Power Partners
I, LLC, Appellants,

v.

ENRON CORP., Appellee.

In re Enron Corp., et al., Debtors.

No. 02 Civ. 5403(JSR).

United States District Court,
S.D. New York.

March 31, 2003.

**40**

Gabriela P. Cacuci, Tancred V. Schiavoni, III, O'Melveny & Myers, LLP, New York City, for plaintiffs.

Richard A. Rothman, Weil, Gotshal & Manges LLP, New York City, Gregory Coleman, John F. Greenman, Weil, Gotshal & Manges LLP, Austin, TX, for Enron Wind Corp.

Carl T. Anderson, Paul, Hastings, Janofsky, Los Angeles, CA, for General Electric Corp.

Michael S. Lurey, Steven Sorell, Latham & Watkins, Los Angeles, CA, for Fortis Bank.

John A. Menke, John R. Paliga, Brenda A. Bachman, Washington, DC, for Pension Benefit Guaranty Corp.

Christopher Meyer, Dynda Thomas, Squire, Sanders and Dempsey LLP, Cleveland, OH, for Official Committee of Unsecured Creditors.

## MEMORANDUM ORDER

RAKOFF, District Judge.

Enron Wind Corp. ("Enron Wind"), a wholly owned subsidiary of Enron Corp., owns (directly and indirectly) various wind power businesses here and in Europe. In February 2002, Enron Wind and its domestic subsidiaries (collectively, the "U.S. Asset Sellers") filed for bankruptcy, a case related to the earlier-filed bankruptcy of the parent corporation. Simultaneously, the U.S. Asset Sellers filed a proposed Sale Agreement, which, as amended, was approved by the Bankruptcy Court on April 15, 2002, see Sale Order, Record on Appeal ("R.") at 782–805.

Under the Sale Agreement, General Electric Co. purchased substantially all of the assets owned by the U.S. Asset Sellers, as well as the assets of certain solvent European subsidiaries of Enron Wind (the "European Asset Sellers") that are not in bankruptcy. See Sale Agreement, R. at 496 (outlining corporate structure); Enron Org. Chart, R. at 893–94 (same).

As compensation therefor, General Electric Co. agreed to pay to the U.S. Asset Sellers and the European Asset Sellers a combined total of $325 million in cash, subject to certain contingent future adjustments, as well as to assume a total of approximately $168 million in combined liabilities. R. at 423–24, 429, 431–32, 1196. But although the Sale Agreement specifically allocated the $168 million in assumed liabilities between the U.S. and European Asset Sellers—with General Electric assuming $28 million in debts of the former and $140 million in debts of the latter, R. at 1196—it made no similar allocation of the $325 million cash payment. Instead, the Sale Agreement provided that the parties:

> will attempt in good faith to agree prior to the Closing on an allocation of the Purchase Price among the Transferred Assets ... provided, however, that the parties hereto will agree on a final allocation of the Purchase Price between the U.S. Asset Sellers in the aggregate,

on the one hand, and the European Asset Sellers ... on the other hand, on or before the hearing to be held before the Bankruptcy Court on such subject matter. . . .

Sale Agreement § 2.12, R. at 431–32.

In approving the Sale Agreement, however, the Bankruptcy Court, in its Sale Order (which had been agreed to by the parties), determined that that court would hold an Allocation Hearing to review the allocations between the U.S. Asset Sellers and the European Asset Sellers and that, based on its determination, the parties would then be obligated to close the sale unless the Bankruptcy Court did not approve an allocation that at least provided the European Asset Sellers with enough funds to cover "excluded liabilities" (*i.e.,* debts that General Electric was not assuming). R. at 802–03. Accordingly, the Bankruptcy Court convened an Allocation Hearing on April 30, 2002, R. at 935–1060, at which conflicting expert testimony was received from, respectively, the U.S. Asset Sellers and Mission Iowa Wind Co. ("Mission Iowa"), one of the creditors of the U.S. Asset Sellers.

At the hearing, the debtors asserted that the U.S. Asset Sellers accounted for roughly 37% of the sales, earnings, and book value of the assets, and argued that accordingly 37% of the $325 million cash payment should be allocated to the U.S. Asset Sellers and 63% to the European Asset Sellers. Mission Iowa, while contesting the 37% figure, argued that even if that were the fairest ratio to use, the allocation must also account for the assumed liabilities; and since the vast majority (83%) of the debt assumed by General Electric was that of the European Asset Sellers, a better allocation would combine the assumed liabilities with the cash payment and allocate 37% of that total consideration ($493 million) to the U.S. Asset Sellers. In dollar terms, this would increase the amount of money allocated to the U.S. Asset Sellers from $120 million to $154 million, thereby, in turn, benefitting the creditors of the U.S. Asset Sellers, namely, Mission Iowa and co-appellant Storm Lake Power Partners I LLC.

Without deciding the merits of this controversy, the Bankruptcy Court, by order dated May 6, 2002, approved the debtors' proposed allocation, finding it fell within the scope of their business judgment. Transcript of Allocation Hearing, R. at 1056–58; Allocation Order, R. at 1061–62. This appeal followed.

██ Preliminarily, appellee moves to dismiss the appeal as moot, since appellants sought no stay of the Allocation Order, with the result that the assets have already been transferred and the monies paid pursuant to 11 U.S.C. § 363(b). Section 363(m) of the Code, 11 U.S.C. § 363(m), provides that the "reversal or modification on appeal of an authorization" of a sale or lease under § 363(b) "does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith ... unless such authorization and such sale ... were stayed pending appeal." However, inherent in the fact that § 363(m) provides only that the *validity* of an unstayed sale cannot be disturbed on appeal is the corollary that other relief may be available and hence not moot. As the Second Circuit stated in *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 105 F.3d 837 (2d Cir.1997), while failure to obtain a stay may deprive the appellate court of jurisdiction so far as invalidation of a sale is concerned, "[i]t is not entirely clear why an appellate court, considering an appeal from an unstayed but unwarranted order of sale ... could not order some other form of relief other than invalidation of the sale." *Gucci*, 105 F.3d at

839–40 & n. 1; *accord, e.g., Wintz v. American Freightways, Inc. (In re Wintz Cos.)*, 219 F.3d 807, 811 (8th Cir.2000) ("Claims against the property once sold may be maintained only against the proceeds of the sale."); *In re Lloyd*, 37 F.3d 271, 273 (7th Cir.1994) (holding that debtor could appeal concerning the distribution of proceeds from a closed sale, even though any claim for the return of the property was moot under § 363(m)); *Osborn v. Durant Bank & Trust Co. (In re Osborn)*, 24 F.3d 1199, 1203–04 (10th Cir.1994) ("[W]here state law or the Bankruptcy Code provides remedies that do not affect the validity of the sale, § 363(m) does not moot the appeal."); *United States v. Salerno*, 932 F.2d 117, 123 (2d Cir.1991) (holding that while an appeal concerning a sale order was moot, appellant was free to object to the distribution of the proceeds).

In this case, the redistribution sought by appellants does not require invalidation of the sale or prejudice to the buyer, because, as the parties estimate, roughly $84 million of the cash payment to the European Asset Sellers will flow upstream to the parent debtor-in-bankruptcy, Enron Wind, and thus return to the jurisdiction of the Bankruptcy Court, thereby making those funds available for redistribution to the creditors of the U.S. Asset Sellers if reallocation is ordered. R. at 944, 1196; *see also* Sale Order ¶ 35, R. at 803–04 (freezing proceeds received from the European Asset Sellers). In other words, if the original allocation was a mistake, it will be possible to correct the error, at least to the extent funds flow back to the debtors. Of course, the extent of the remedy may be limited by the actual amount of the funds that find their way from the European Asset Sellers to the estates of the bankrupts, but the fact that there may be a limit on the extent to which

a reallocation may be effected is far different from saying that no reallocation is possible at all, thereby depriving the Court of jurisdiction.

Similarly, while debtors represent that a reallocation might have serious tax consequences for General Electric, they have failed to show how this would be so or how, indeed, they are in a position to even so opine. As to debtors' more general argument that reallocation would in effect rewrite the deal agreed to by the parties, in actuality the Sale Order shifted to the Bankruptcy Court ultimate approval of any allocation, and required the parties to close the deal regardless of that outcome, subject only to the provision that the Bankruptcy Court not approve any allocation that did not at least cover the excluded liabilities of the European Asset Sellers.[1] Within this limitation, numerous reallocations are possible.

Finally, it bears mention that according to the parties to the appeal, General Electric itself, pursuant to the provision for certain contingent future adjustments, is now seeking a refund in the purchase price of not less than $160 million, *i.e.*, nearly half of the cash payment it made, a refund that could itself affect the allocation between the U.S. and European Asset Sellers. *See* Schiavoni Decl.; Sale Agreement § 2.18, R. at 436–37. This suggests that the "sale" involved in this case is more fluid than the appellees urge and that a reallocation would not disturb genuinely settled expectations on the part of the buyer.

In short, the appeal is not moot, and the motion to dismiss the appeal is therefore denied. But does the appeal have merit? In particular, did the Bankruptcy Court err in so entirely deferring to the debtors'

---

**1.** To the extent that some of the Bankruptcy Court's statements may have suggested a different understanding, *see* R. at 1056, this was a mistake of law.

business judgment to determine the appropriate allocation?

 Where a debtor attempts to sell substantially all of its assets pursuant to 11 U.S.C. § 363(b), instead of waiting for confirmation of a reorganization plan and the safeguards that that process provides, more than cursory scrutiny is required by the Bankruptcy Court. *See Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir.1983). Among the factors that a bankruptcy judge should consider in evaluating a proposed § 363(b) sale is "the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property," *id.* at 1071, that is, whether the debtor is getting a fair price for the assets, *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 677 (Bankr. S.D.N.Y.1989). *See also* 3 Collier on Bankruptcy ¶ 363.02[4] (15th rev'd ed.1996) (noting that price obtained for the assets must be "fair and reasonable"). Here, although the Bankruptcy Court did find that the total consideration paid for both the U.S. and European Assets was fair and reasonable, Sale Order, R. at 786–87, it explicitly avoided any analysis of the allocation itself, R. at 1056–58, believing that this was a matter of deference to the parties' business judgment.

 While there might be circumstances where such deference was appropriate, here the Bankruptcy Court had an ample basis on which to make an independent determination of whether the allocation was fair and reasonable. Such scrutiny was particularly appropriate here, moreover, because, as it turns out, it was Enron Corp., and not Enron Wind or its U.S. subsidiaries, that negotiated the deal with General Electric. Dep. of Adam Umanoff, President Enron Wind, R. at 902–03. Enron Corp. may have had a special interest in allocating more of the purchase price to the European Asset Sellers than to the U.S. Asset Sellers, because, as mentioned, monies paid to the European Asset Sellers would then flow back to Enron Wind—free, given the allocation, of further claims by the creditors of its subsidiaries (including appellants)—from whence such funds could flow to the parent Enron Corp. and *its* creditors. R. at 890–91, 1196. Given the duty of bankruptcy courts to preserve the integrity of separate estates and allocate value to the estate that owns the asset sold, not its parent, *see, e.g., In re White Motor Credit Corp.*, 14 B.R. 584, 591–92 (Bankr.N.D.Ohio 1981), meaningful scrutiny of the allocation here in issue is needed, among other reasons, to address the possibility that the allocation may have been infected by self-dealing on the part of Enron Corp.

Accordingly, it is incumbent on the Bankruptcy Court in these circumstances not to defer in conclusory fashion to the debtors' business judgment but to consider on the merits whether the price allocated to the U.S. Asset Sellers was a fair reflection of those assets' relative value and to make findings of fact on that question. For these purposes, the Court vacates the Allocation Order of the Bankruptcy Court and remands the matter for further proceedings consistent with this opinion. Clerk to enter judgment.

SO ORDERED.