**In re ADELPHIA COMMUNICATIONS CORPORATION, et al., Debtors.**

**ACC Bondholder Group, Appellants,**

v.

**Adelphia Communications Corporation, et al., Appellees.**

**No. 02–41729.**
**No. 07 Civ. 1172(SAS).**

United States District Court,
S.D. New York.

April 2, 2007.

Weil, Gotshal & Manges LLP, by: Martin J. Bienenstock, Esq., Brian S. Rosen, Esq., Richard W. Slack, Esq., Vernon S. Broderick, Esq., New York, NY, by: Melanie Gray, Esq., Sylvia Mayer, Esq., Houston, TX, Stutman, Treister & Glatt P.C., by: Isaac M. Pachulski, Esq., Stephan M.

Ray, Esq., Los Angeles, CA, for the ACC Bondholder Group.

Willkie Farr & Gallagher LLP, by: Marc Abrams, Esq., Brian E. O'Connor, Esq., Roger D. Netzer, Esq., Paul V. Shalhoub, Esq., Terence K. McLaughlin, Esq., New York, NY, for Debtors and Debtors in Possession.

Kasowitz, Benson, Torres & Friedman LLP, by: David M. Friedman, Esq., Adam L. Shiff, Esq., Michael C. Harwood, Esq., New York, NY, for the Official Committee of Unsecured Creditors.

Morgenstern Jacobs & Blue LLC, by: Gregory A. Blue, Esq., Eric B. Fisher, Esq., New York, NY, for Official Committee of Equity Security Holders.

Sheppard Mullin Richter & Hampton LLP, by: Metter H. Kurth, Esq., Los Angeles, CA, for U.S. Bank National Association, as Indenture Trustee in Respect of the Arahova Notes.

Seward & Kissel LLP, by: Arlene R. Alves, Esq., New York, NY, for Law Debenture Trust Company of New York, as ACC Senior Notes Trustee.

White & Case LLP, by: J. Christopher Shore, Esq., New York, NY, for the Ad Hoc Committee of Arahova Noteholders.

Fried Frank Harris Shriver & Jacobson LLP, by: Gary L. Kaplan, Esq., New York, NY, for W.R. Huff Asset Management Co., L.L.C.

Haynes and Boone, LLP, by: Robin E. Phelan Esq., Judith Elkin, Esq., New York, NY, for Bank of America, N.A., as Administrative Agent for the Century Cable Lenders.

Bracewell & Giuliani, LLP, by: Jennifer Feldcher, Esq., New York, NY, for the Ad Hoc Committee of Non–Agent TCI and Parnassos Lenders.

Simpson Thacher & Bartlett LLP, by: Peter Pantaleo, Esq., Elisha D. Graff, Esq., New York, NY, for Wachovia Bank, N.A., as Administrative Agent for the UCA Lenders.

Mayer, Brown, Rowe & Maw LLP, by: Kenneth E. Noble, Esq., New York, NY, for Bank of Montreal, as Administrative Agent for the Olympus Lenders.

Goodwin Procter LLP, by: Michael K. Isenman, Esq., Washington, D.C., by: Gina Lynn Martin, Esq., Boston, MA, by: Allan S. Brilliant, Esq., New York, NY, for Highfields Capital Management and Tudor Investment Corporation.

Pachulski, Stang, Ziehl, Young, Jones & Weintraub LLP, by: Dean Ziehl, Esq., New York, NY, by: Richard Pachulski, Esq., Los Angeles, CA, for Ad Hoc Bondholders' Committee (a/k/a Committee II).

Clifford Chance U.S. LLP, by: Andrew Brozman, Esq., James Moyle, Esq., New York, NY, for Calyon New York Branch.

Clifford Chance U.S. LLP, by: Angelique Shingler, Esq., New York, NY, for Bank of N.Y.

Cadwalader Wickersham & Taft LLP, by: Kathryn L. Turner, Esq., New York, NY, for Perry Capital, LLC.

Sidley Austin LLP, by: Lee S. Attanasio, Esq., New York, NY, for the Fort Myers Noteholders.

Ropes & Gray, LLP, by: David Elkind, Esq., New York, NY, for Satellite Asset Management, L.P.

Schulte Roth & Zabel, by: Adam C. Harris, Esq., New York, NY, to Och Ziff Capital Management and Chesapeake.

Cole, Schotz, Meisel, Forman & Leonard, P.A., by: John H. Drucker, Esq., New York, NY, for the Class Action Plaintiffs.

Kramer Levin Naftalis & Frankel LLP, by: Kenneth H. Eckstein, Esq., Jeffrey S. Trachtman, Esq., New York, NY, for the FrontierVision Ad Hoc Committee.

Latham & Watkins LLP, by: Robert J. Rosenberg, Esq., New York, NY, to the Olympus Noteholders Committee.

Milbank, Tweed, Hadley & Mc Cloy LLP, by: James C. Tecce, Esq., New York, NY, for JPMorgan Chase Bank.

Kirkland & Ellis LLP, by: Richard L. Wynne, Esq., Michael I. Gottfried, Esq., Los Angeles, CA, for Ad Hoc Committee of Lenders.

Cleary, Gottlieb, Steen & Hamilton, by: Lindsee P. Granfield, Esq., Luke A Barefoot, Esq., Jane Kim, Esq., New York, NY, for Certain Investment Banks.

Satterlee, Stephens, Burke & Burke, LLP, by: Christopher R. Belmonte, Esq., New York, NY, for Prestige Communications.

Shearman & Sterling, LLP, by: Marc B. Hankin, Esq., United States Securities and Exchange Commission, by: Patricia Schrage, Esq., New York, NY, for Rembrandt Technologies, L.P.

Kleinberg, Kaplan, Wolff & Cohen, PC, by: David Parker, Esq., New York, NY, for Elliot Associates, LP and John Pike.

Kelley, Drye & Warren, LLP, by: Geoffrey W. Castello, Esq., Parsippany, NJ, for Wilmington Trust Co.

Dorsey & Whitney, LLP, by: Katherine A. Constantine, Esq., Minneapolis, MN, for U.S. Bank, N.A., as Indenture Trustee.

Wilmer, Cutler, Pickering, Hale & Dorr, LLP, by: Joel Millar, Esq., New York, NY, for Credit Suisse and Royal Bank of Scotland.

Luskin, Tern & Eisler, LLP, by: Michael Luskin, Esq., New York, NY, for The Bank of Nova Scotia.

Farrell Fritz, P.C., by: Louis A. Scarcella, Esq., Uniondale, NY, for Associated Electric & Gas.

Brown Rudnick Berlack Israels, LLP, by: Steven D. Pohl, Esq., Boston, MA, for the Ad Hoc Adelphia Trade Claims Committee and Ad Hoc Committee of Holding Company Trade Claims.

Baker Botts, LLP, by: Eric Soderlund, Esq., Dallas, TX, Office of the United States Trustee, by: Tracey Hope Davis, Esq., New York, NY, for Verizon Media Ventures.

## *OPINION AND ORDER*

SCHEINDLIN, District Judge.

The present dispute arises out of the approximately 230 jointly administered chapter 11 cases of Adelphia Communications Corporation ("ACC") and its subsidiaries (collectively, the "Debtors"). The ACC Bondholder Group [1] appeals from the Bankruptcy Court's confirmation order (the "Confirmation Order") approving the First Modified Fifth Amended Joint Chapter 11 Plan (the "Plan").[2] On January 24, 2007, the Court granted a stay pending appeal, which it then vacated on February 12, 2007 due to Appellants' failure to post a reasonable bond, thereby permitting the

---

**1.** The ACC Bondholder Group is comprised of holders and/or investment advisors to certain holders of over one billion dollars of notes and debentures issued by the parent company, ACC, in the aggregate principal amount of $4.9 billion (or $5.1 billion including prepetition accrued interest), namely: Aurelius Capital Management, LP, Banc of America Securities LLC, Catalyst Investment Management Co., LLC, Drawbridge Global Macro Advisors LLC, Drawbridge Special Opportunities Advisors LLC, Elliott Associates, LP, Farallon Capital Management L.L.C, Lehman Brothers, Inc. (Global Principal Strategies Business), Noonday Asset Management L.P., Perry Capital LLC, and Viking Global Investors LP (collectively, the "ACC Bondholder Group" or "Appellants").

**2.** *See* Bench Decision on Confirmation, dated January 3, 2007 ("Bench Dec.").

Plan to go effective.[3] Nonetheless, Appellants are seeking to pursue their appeal. In light of the fact that the Plan has become effective, the Court requested that the parties separately brief the issue of equitable mootness. For the reasons discussed below, I conclude that this appeal must be dismissed on equitable mootness grounds. As a result, I will not address the merits of the appeal.

## I. BACKGROUND

This Opinion assumes familiarity with the facts summarized in the Bankruptcy Court's January 3, 2007 Bench Decision as well as this Court's Opinion and Order granting the stay pending appeal (the "Stay Opinion").[4] Additional facts and procedural history relevant to this Opinion are set forth below.

On January 24, 2007, in a separate proceeding on an application for a stay of the Bankruptcy Court order pending appeal, this Court granted a stay that prevented the Plan from going effective during the pendency of the appeal. The Court conditioned that stay on the requirement that Appellants post a substantial bond. The Court set that bond at $1.3 billion after taking into account the estimated harms that Appellees stood to suffer during the appeal. The bond was to be posted in full within seventy-two hours following the date of the Stay Opinion. Appellants chose not to post that bond. Instead, Appellants sought an interim "one-judge" stay from the Second Circuit in order to appeal this Court's bond requirement. Appellees did not appeal the grant of the

stay. The "one-judge" stay was entered, preserving the status quo without Appellants posting any bond.

Before the Second Circuit, Appellants argued that this Court's granting of the stay only on condition that a substantial bond be posted was, in effect, a denial of the stay. Crucially, however, Appellants did not (and could not) claim that they were *unable* to post that amount. Rather, their position was that the posting of a bond in that amount would be an imprudent business decision for their clients. Because it did not find that Appellants were incapable of posting a bond, which would have meant that the imposition of a bond amounted to a denial of a stay, the Second Circuit dismissed the appeal for lack of jurisdiction. However, in the Second Circuit's decision, the court stated that the ACC Bondholder Group was not precluded from

> returning to the District Court to seek modification of the bond amount (a) if it can show that it is in fact unable (rather than unwilling) to post the required amount or (b) to present alternative arrangements for the District Court's consideration that might lessen the amount of harm likely to be suffered by the Appellees in the event of an unsuccessful appeal, thereby perhaps justifying a reduction in the amount of the bond.[5]

Appellants did indeed return to this Court to obtain a modification of the bond, but only under the second alternative posed by the Second Circuit. During the hearing on the modification issue, Appellants persis-

**3.** *See In re Adelphia Commc'ns Corp.*, 361 B.R. 337 (S.D.N.Y.2007) (granting the stay subject to the posting of a bond), *appeal dismissed*, No. 07–0279–bk (2d Cir. Feb. 9, 2007).

**4.** Terms used but not defined herein shall have the same meaning ascribed to them in the Stay Opinion.

**5.** *In re Adelphia Commc'ns Corp.*, slip op. at 4 (2d Cir. Feb. 9, 2007).

tently refused to post a bond greater than $10 million.[6] Because such a small bond was unacceptable to the Court in light of the magnitude of threatened harm to Appellees, the Court vacated the stay.

The Plan went effective immediately after the Court vacated the stay. On the Effective date, the Debtors commenced distributions under the Plan. Pursuant to the Plan, over $6.49 billion in cash has been distributed to more than 8,000 holders of Allowed Claims (as defined in the Plan); approximately 117,789,000 freely tradable shares of Time Warner Cable ("TWC") Class A Common Stock has been distributed to approximately 13,500 holders of Allowed Claims; and more than 9.56 billion freely tradable CVV Interests have been distributed to more than 8,000 holders of Allowed Claims and more than 23,000 holders of Equity Interests.[7] Those who have received TWC shares or CVV Interests have since been free to sell, encumber, or otherwise dispose of those shares or CVV Interests.

6. Indeed, the Court attempted to facilitate the modification hearing by suggesting several alternative bond amounts, all of which Appellants declined. *See* February 12, 2007 Hearing Transcript ("2/12/07 Tr.") at 30 ("[Appellants can] be the holdback. Go ahead and hold back your 900 million [dollar distribution under the Plan] or a reasonable portion of it . . . ."), 45 (suggesting a bond "somewhere between 250 and 500 million [dollars]"), 27 (suggesting a bond "in the range of 250 million dollars").

7. *See* Plan Proponents' Memorandum of Law in Response to Appellant's Brief on Mootness ("Appellees' Mootness Mem."), at 4–5.

8. *See* 28 U.S.C. § 158(a).

9. *See id.* § 158(a)(1).

10. *In re Palm Coast, Matanza Shores Ltd. P'Ship*, 101 F.3d 253, 256 (2d Cir.1996).

11. *See In re Worldcom, Inc.*, No. M47, 2003 WL 21498904, at *5 (S.D.N.Y. June 30, 2003).

## II. LEGAL STANDARD

### A. Appeals of Bankruptcy Court Orders

#### 1. Final Order

■ The district courts are vested with appellate jurisdiction over bankruptcy court rulings.[8] Final orders of the bankruptcy court may be appealed to the district court as of right.[9] An order is final if "[n]othing in the order . . . indicates any anticipation that the decision will be reconsidered."[10] Courts have held that an order confirming a plan of reorganization is final.[11]

#### 2. Standard of Review

■ A district court functions as an appellate court in reviewing judgments rendered by bankruptcy courts.[12] Findings of fact are reviewed for clear error.[13] A finding of fact is clearly erroneous if the court is " 'left with the definite and firm conviction that a mistake has been committed.' "[14] A bankruptcy court's conclusions

The parties do not dispute that the Bankruptcy Court's Confirmation Order is final.

12. *See In re Sanshoe Worldwide Corp.*, 993 F.2d 300, 305 (2d Cir.1993) ("[Appellant] relies on several cases for the reasonable proposition that the district court acts as an appellate court in reviewing a bankruptcy court's judgments.").

13. *See* Fed. R. Bankr.P. 8013 ("Findings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."). *Accord In re Cody, Inc.*, 338 F.3d 89, 94 (2d Cir.2003).

14. *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1388 (2d Cir.1990) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).

of law, by contrast, are reviewed de novo.[15]

## B. Judicial Estoppel

 "The equitable doctrine of judicial estoppel provides that, '[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, [it] may not thereafter, simply because [its] interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by [it].' "[16] A litigant who asserts judicial estoppel must establish that "(1) the party against whom judicial estoppel is being asserted advanced an inconsistent factual position in a prior proceeding, and (2) the prior inconsistent position was adopted by the first court in some manner."[17] Moreover, application of judicial estoppel is limited "to situations where the risk of inconsistent results with its impact on judicial integrity is certain."[18]

## C. Mootness

 The Second Circuit has held that "when, during the pendency of an appeal, events occur that would prevent the appellate court from fashioning effective relief, the appeal should be dismissed as moot."[19]

Mootness in that context refers to constitutional mootness, the Article III prudential doctrine that requires that only live cases or controversies be heard by the courts.[20] In the bankruptcy context, however, the broader doctrine of equitable mootness has evolved in appeals of confirmation orders. The equitable mootness doctrine furthers the principle that "the ability to achieve finality is essential to the fashioning of effective remedies."[21] Under the doctrine of equitable mootness, an appeal should be dismissed when, "even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable."[22] "Completed acts in accordance with an unstayed order of the bankruptcy court must not thereafter be routinely vulnerable to nullification if a plan of reorganization is to succeed."[23]

### 1. Presumption of Equitable Mootness upon Substantial Consummation

 Equitable mootness of an appeal of a bankruptcy court order confirming a plan of reorganization under chapter 11 is presumed when the reorganization plan has been substantially consummated during the pendency of the appeal.[24] The

**15.** See In re Cody, 338 F.3d at 94; In re 139–141 Owners Corp., 313 B.R. 364, 367 (S.D.N.Y.2004) (same).

**16.** Uzdavines v. Weeks Marine, Inc., 418 F.3d 138, 147 (2d Cir.2005) (quoting New Hampshire v. Maine, 532 U.S. 742, 749, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001)).

**17.** United States v. Hussein, 178 F.3d 125, 130 (2d Cir.1999).

**18.** Uzdavines, 418 F.3d at 147.

**19.** Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. Official Comm. of Unsecured Creditors of LTV Steel Co. (In re Chateaugay Corp.) ("Chateaugay I"), 988 F.2d 322, 325 (2d Cir.1993).

**20.** Constitutional mootness is not at issue on this appeal.

**21.** Chateaugay I, 988 F.2d at 325.

**22.** Id. (stating that principles of mootness are "especially pertinent in bankruptcy proceedings, where the ability to achieve finality is essential to the fashioning of effective remedies"). Accord In re Metromedia Fiber Network, Inc., 416 F.3d 136, 144 (2d Cir.2005).

**23.** Chateaugay I, 988 F.2d at 326.

**24.** See Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.) ("Chateaugay III"), 94 F.3d 772, 776 (2d Cir.1996) ("Reviewing courts presume that it will be inequitable or impractical to grant relief after substantial consummation of a plan of reorganization.").

Code defines substantial consumption as "(A) transfer of all or substantially all of the property proposed by the plan to be transferred; (B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (C) commencement of distribution under the plan." [25]

### 2. Rebutting the Presumption of Equitable Mootness

■ The presumption of mootness may be rebutted, but only upon a showing of the following:

(a) the court can still order some effective relief; (b) such relief will not affect the re-emergence of the debtor as a revitalized corporate entity; (c) such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court; (d) the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; and (e) the appellant pursue[d] with diligence all available remedies to obtain a stay of execution of the objectionable order ... if the failure to do so creates a situation rendering it

inequitable to reverse the orders appealed from.[26]

An appellant faced with the presumption of mootness due to substantial consummation "must demonstrate *each* of five factors set forth in [*Chateaugay II*]." [27]

## III. DISCUSSION

### A. Judicial Estoppel

■ Appellees assert that Appellants should be judicially estopped from asserting that the appeal is not equitably moot because Appellants' position on the stay application was that the stay was necessary mainly because equitable mootness was a near certainty. Appellants argued at every turn that the stay was necessary to protect their right to appeal because without a stay they would lose their appellate rights due to the grave risk of equitable mootness. Indeed, the factor that weighed most heavily in favor of the Court's granting of Appellants' application for a stay pending appeal was Appellants' assertion of irreparable harm stemming from equitable mootness. In briefing to the Second Circuit, Appellants again asserted that a stay was necessary because failing to grant a stay would " 'eliminate appellate review.' " [28]

Moreover, even after the Court granted the stay and Appellants returned to the Court to seek a modification of the bond,

---

25. 11 U.S.C. § 1101(2). Substantial consummation precludes modification of a plan. *See id.* § 1127.

26. *Frito–Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.) ("Chateaugay II"),* 10 F.3d 944, 952–53 (2d Cir.1993) (citations and quotations omitted).

27. *In re Loral Space & Commc'ns Ltd.,* 346 B.R. 71, 72 (S.D.N.Y.2006) (emphasis added). *Accord Chateaugay II,* 10 F.3d at 952 ("[S]ubstantial consummation will not moot an appeal if *all of the following [five] circumstances exist* ...." (emphasis added)); *In re Kenwin*

*Shops, Inc.,* No. 99 Civ. 10485, 2000 WL 351404, at *2 (S.D.N.Y. Apr. 5, 2000) (appellant "must show that each of the five *Chateaugay* factors supports maintaining its appeal.").

28. Appellees' Mootness Mem. at 3 (quoting Appellants' Second Circuit Emergency Motion Memorandum of Law, at 21). *See also id.* (quoting Appellants' Brief in Support of Stay Pending Mandamus Petition, at 31, as stating that the absence of a stay would prevent Appellants from having "an effective opportunity for appellate review").

Appellants continued to insist that they were "asking to avoid mootness."[29] As it turned out, however, Appellants did not want the stay badly enough to risk anything other than a trivial bond relative to the potential harm to the estate that could result from the stay. Indeed, by the end of that hearing, Appellants conceded that they no longer sought a stay.

Appellants now claim that the appeal is not equitably moot. But the only thing that has changed since Appellants' repeated threats that they will lose their appellate rights in the absence of a stay— besides the Plan taking effect—is that Appellants' interests have changed. Specifically, Appellants initially argued that they were entitled to a stay with little or no bond based on the grave threat of mootness and lack of appellate review, but now, after that strategy has failed, Appellants argue that their appeal is not moot after all. The very purpose of judicial estoppel is to prevent a party from taking such inconsistent positions merely because that party's interests have changed.

Both elements of judicial estoppel are satisfied here. *First*, during the stay application proceeding, Appellants advanced the position that their appeal would be equitably moot if the Plan were permitted to go forward,[30] which is inconsistent with their position in the present appeal. *Second*, the Court adopted Appellants' position at the stay proceeding and found that equitable mootness, and equitable mootness alone, would constitute irreparable harm sufficient to outweigh the harm to the Appellees and the estate such that a stay would be proper.[31]

Moreover, all of the arguments that Appellants now raise on appeal could have been, and should have been, raised on the stay application, especially given that the Court invited the parties to address whether the Plan could go effective without resulting in equitable mootness. If Appellants had made the arguments then that they make now, the three-week delay in the effective date of the Plan might have been avoided.[32] Appellants' inconsistent positions have had an impact on judicial integrity and have prejudiced Appellees.[33] Thus, the appeal should be dismissed as equitably moot on judicial estoppel grounds alone.[34]

29. 2/12/07 Tr. at 8.

30. The mere fact that Appellants attempted to reserve their right to argue that the appeal is not moot if the stay were not granted does not save them here. The stay *was* granted; they just chose not to comply with the bond condition or to negotiate a realistic modification of that condition. Appellants cannot seriously claim that they did not argue to the Court that equitable mootness was for all intents and purposes a certainty.

31. The stay proceeding was a separate and independent proceeding from the present appeal. Thus, this is not an instance where a party is pleading in the alternative, as Appellants suggest. *See* Reply Brief of Appellants in Opposition to Claims of Mootness and Equitable Mootness ("Appellants' Mootness Reply"), at 10.

32. This three-week delay caused tangible, and far less than trivial, harm to Appellees and the estate in terms of the accrual of interest on debt, which was estimated to accrue at $2.4 million per day, *see In re Adelphia Commc'ns Corp.*, 361 B.R. at 351, for a total amount of over $50 million, as well as the accrual of professional fees and expenses, *see id.*

33. I have little doubt that Appellants used the Court to obtain bargaining leverage to extract a better deal for their clients with no intention of ever posting a reasonable bond. Such behavior is cynical at best and unprincipled at worst.

34. Judicial estoppel seems particularly well-suited to apply here because the issue raised in this appeal is one of equity, where the Court's inquiry is whether it would be equitable, as opposed to merely possible, to afford relief to Appellants despite substantial con-

## B. Equitable Mootness

 Even if Appellants were not judicially estopped from denying the equitable mootness of this appeal, I conclude that the appeal is equitably moot. Appellees argue that the Plan has been substantially consummated, cataloging all of the steps that have been taken since the stay was lifted and the Plan went effective. Appellants do not (and could not) dispute that the Plan has been substantially consummated. Accordingly, the *Chateaugay* presumption of mootness applies, and this appeal must be dismissed unless Appellants can rebut that presumption by demonstrating that each of the five *Chateaugay* factors supports permitting this appeal to be heard on the merits.[35] As discussed below, Appellants fail to meet their burden on four of the five *Chateaugay* factors.[36]

### 1. Whether Effective Relief Can Be Granted

When the Court addressed Appellants' application for a stay pending appeal, it requested letter briefs on the issue of whether a disgorgement remedy would be feasible upon the hypothetical reversal of an unstayed confirmation order. In support of disgorgement, Appellants stated that disgorgement is "[w]orkable with [p]rotections," and cited to a single chapter 11 case where the bankruptcy court permitted approximately $213 million in disputed funds to be distributed to holders of notes, subject to disgorgement.[37] In opposition, Appellees argued that notwithstanding the "array of novel and complex" jurisdictional and practical questions raised by the idea of disgorging distributions, once the estimated 111 million shares of freely tradable TWC Stock are distributed to 14,000 parties, and the estimated 9.4 billion CVV Interests and $7,136 billion in cash are distributed to over 10,000 parties, disgorgement becomes, for all intents and purposes, impossible.[38]

On appeal, Appellants maintain that effective relief can be granted in either of two ways. Appellants argue that the MIA Litigation could be permitted to proceed to judgment or settlement and that the Court, *ex post*, could order disgorgement of Plan distributions from creditors who had received in excess of the amount that

---

summation of the Plan. Under the circumstances of this case, it is not equitable to permit Appellants to obtain the benefits of their inconsistent positions to the detriment of Appellees and all other creditors.

**35.** *See Chateaugay II*, 10 F.3d at 952.

**36.** Appellants' overarching theme is that their appeal is not equitably moot because the "court can fashion some form of meaningful relief." Brief of Appellants in Opposition to Claims of Mootness and Equitable Mootness ("Appellants' Mootness Mem."), at 10. That is not the standard. Appellants quote a Third Circuit decision that " 'even if [such relief] only partially redresses the grievances of the prevailing party, the appeal is not moot.' " *Id.* (quoting *In re Continental Airlines*, 91 F.3d 553, 558 (3d Cir.1996) (en banc)). A close reading of that decision, however, reveals that Appellants have "fallen into the trap" of confusing equitable and constitutional mootness.

*In re Continental Airlines*, 91 F.3d at 559. The quote used by Appellants was taken from the court's discussion of constitutional mootness, not equitable mootness. *See id.* at 558. Constitutional mootness, however, has never been an issue in this case.

**37.** 1/19/07 Letter from Martin J. Bienenstock at 2–3 (citing *In re Kaiser Aluminum Corp.*, No. 02–10429 (Bankr.D.Del. Mar. 3, 2006) (Docket No. 8370) (requiring each noteholder receiving a distribution to execute an affidavit agreeing to return all distributions within thirty days after notification of the entry of a final order reversing the distribution on appeal)).

**38.** 1/19/07 Letter from Marc Abrams and Adam L. Shiff, counsel to the Debtors and the Creditors Committee, respectively, at 1.

they are entitled to receive pursuant to such judgment or settlement.[39] In the alternative, the Court, *ex ante*, could order "the immediate return of disputed distributions (or their equivalent value if transferred) from ACC creditors, Arahova noteholders, and any other creditors whose distributions are seriously contested" pending the outcome of the MIA Litigation.[40]

Appellees argue, much like they did in opposing the stay, that disgorgement is not feasible. They argue that a substantial portion of the billions of dollars in cash, TWC stock and CVV Interests that have been distributed to tens of thousands of distributees was distributed through intermediaries, and that the "actual identities of nearly all of the true stakeholders are not even known (and are confidential unless they consent to their disclosure)."[41] Moreover, it is likely that the distributions have changed hands several times since the Plan has gone effective.

Appellants claim that disgorgement is an available remedy based on the following four arguments. *First,* they argue that the facts that Debtors were able to transmit ballots to creditors and that the ballots were returned "show[ ] that the parties can locate the beneficial holders who received ballots or distributions and serve them with orders of disgorgement."[42] *Second,* they claim that Debtors "still hold massive quantities of cash and other consideration."[43] *Third,* Appellants argue

that the Court can "nullify improperly granted releases and exculpation."[44] *Fourth,* they assert that the "major holders of Arahova and ACC notes are not only on notice here, they are active participants in the appeal, and all other creditors can be given notice."[45] None of these assertions withstands scrutiny.

With respect to the first assertion, for example, Appellees explain that, much like the distributions, the solicitation of votes of beneficial holders was done through intermediaries and that the majority of those beneficial holders are unknown and confidential. Moreover, the solicitation process was completed several months before confirmation and thus, many of those holders could have liquidated or transferred their ownership in the interim.

Appellants' fourth assertion that disgorgement "is fully within this Court's authority" because "most of the substantial holders of Arahova and ACC notes are already participants in this appeal"[46] serves only to highlight one of the pervading flaws in Appellants' position. Appellants consistently assert that the Inter–Creditor Dispute is a zero-sum game between two groups: the ACC Noteholders and the Arahova Noteholders. However, as Appellees point out, that is simply not the case, as demonstrated by the fact that various other classes of creditors agreed to a total of well over one billion dollars in give-ups under the Plan to settle the In-

---

**39.** *See* Appellants' Mootness Mem. at 6.

**40.** *Id.* Interestingly, when the parties were before the Court on the stay application, Appellants (who are ACC creditors) scoffed at the idea of pledging any of their distributions to satisfy a bond requirement. If they had made this offer then, they may very well have avoided the entire mootness problem.

**41.** Appellees' Mootness Mem. at 9.

**42.** Appellants' Mootness Mem. at 7–8.

**43.** *Id.* at 8.

**44.** *Id.*

**45.** *Id.*

**46.** *Id.* at 7.

ter–Creditor Dispute.[47] Indeed, Appellees argue that if there were truly only two groups involved in the Inter–Creditor Dispute, there would have been no incentive for the other creditors to opt into the resolution process.[48]

Moreover, despite Appellants' conclusory assertion of the availability of disgorgement, Appellants do not explain how disgorgement would work in practice, other than an additional conclusory assertion that ordering disgorgement "will require postage or email, not rocket science." [49] The various attempts to oversimplify this case highlight its complexities.[50] In short, it is far from evident that an effective remedy can still be granted in this case.

## 2. Whether Such Relief Will Negatively Affect Re-emergence of the Debtor

The parties do not dispute that Debtors have been liquidated and effectively cease to exist. As a result, the second *Chateaugay* factor is inapposite.

## 3. Whether Such Relief Will Unravel Intricate Transactions

Even if disgorgement were available as effective relief in this case, such relief would be inequitable because it would "unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court." [51] A Global Settlement was reached and implemented. Billions of dollars were distributed in cash, TWC stock and CVV Interests. Thousands of creditors have undoubtedly entered into countless transactions with their distributions since the Plan went effective. The TWC stock went public without an IPO in reliance on the section 1145 exemption in the Plan. The Government Restitution Fund was estab-

---

47. *See* Appellees' Mootness Mem. at 13.

48. Appellants' alternative argument on their fourth assertion that disgorgement is within the Court's authority because "all creditors can be given notice of the appeal," Appellants' Mootness Mem. at 7, is unsupported, as more fully discussed below. *See infra* Part III.B.4.

49. Appellants' Mootness Mem. at 8. By contrast, Appellees raise several questions regarding how disgorgement would be effected. For example, they point out that Appellants never established that the court would have jurisdiction over creditors who have received an unencumbered distribution under the Plan. *See* Appellees' Mootness Mem. at 11 & n.10. Appellants themselves raised this concern in the January 19, 2007 letter briefing on disgorgement, stating that there may be a question of whether creditors, once they received the distributions under the plan, are still subject to the court's subject matter jurisdiction. *See* 1/19/07 Letter from Martin J. Bienenstock at 1. That such questions remain unanswered lends support to the con-

clusion that disgorgement is not a realistic remedy in this case.

50. As another example, Appellants attempt to cast this multi-billion dollar plan of reorganization that includes a global settlement, and distributions of cash, stock and interests in a litigation vehicle as a mere "reallocation of discrete assets." Appellants' Mootness Mem. at 9. Appellants cite *Mission Iowa Wind Co. v. Enron Corp. (In re Enron Corp.)*, 291 B.R. 39 (S.D.N.Y.2003), for the proposition that appeals in cases involving reallocation of discrete assets are not moot even in the absence of a stay. *See* Appellants' Mootness Mem. at 9; Appellants' Mootness Reply at 2. However, *Mission Iowa* involved an asset sale, which the court itself distinguished from a confirmation of a plan of reorganization, and did not involve any issue of equitable mootness; indeed, *Chateaugay* was never mentioned. Rather, the court analyzed whether the bankruptcy court would lose jurisdiction as a result of the asset sale thus rendering the appeal moot. This case is inapposite here.

51. *Chateaugay II,* 10 F.3d at 953.

lished. These transactions cannot be unraveled, nor would it be equitable to unravel them to provide Appellants relief on this appeal.

Appellants do not explain why the Court should order selective disgorgement from cherry-picked creditors as opposed to ordering disgorgement from all creditors (assuming such relief were available), nor do they explain how the Court could do so. Appellees argue, persuasively, that such relief would rewrite the terms of the bargain, which is beyond the power of the Court. Moreover, to order disgorgement from a select few creditors is inequitable because those creditors would not be able to recoup their losses by pursuing other creditors as they agreed to relinquish those claims as part of the Global Settlement. Thus, the only way to permit disgorgement is to dissolve the Global Settlement, which surely would "knock the props out from under the authorization for every transaction that has taken place"[52] under the Plan. Ordering disgorgement, even if feasible (which is doubtful), would cause the unraveling of the Plan, and thus, Appellants fail to satisfy the third *Chateaugay* factor.

### 4. Whether Parties Adversely Affected Have Had Notice and Opportunity to Participate in the Appeal

Appellants argue that they have satisfied the fourth *Chateaugay* factor based on the following: (1) they have sought to provide potentially affected parties with notice of the appeal and the relief sought and that they "have named all known potentially affected parties as Appellees"; (2) "[a]ll distributees can be given written notice of potential disgorgement"; and (3) "the wire services ran stories that notified all creditors that their distributions may be subject to disgorgement."[53] Further, they argue, the press coverage of the confirmation hearing and stay litigation provides "constructive notice" to potentially affected parties.[54]

Appellees counter that no notice of a risk of disgorgement has been provided.[55] Indeed, Appellants requested several times that the Bankruptcy Court, this Court or the Second Circuit provide notice to all creditors of possible disgorgement but those requests were refused.[56] Moreover, the Confirmation Order provided that creditors could keep what they received and that many of the distributees have undoubtedly entered into transactions in reliance on that provision.[57] Fur-

---

52. *Id.*

53. Appellants' Mootness Mem. at 11–12.

54. *Id.*

55. *See* Appellees' Mootness Mem. at 17–18.

56. *See id.* at 18.

57. *See* Bankruptcy Court's Order Confirming First Modified Fifth Amended Joint Chapter 11 Plan for Adelphia Communications Corporation and Certain of Its Affiliated Debtors, ¶ 57, which provides:
Subject to applicable law, if any or all of the provisions of this Order are hereafter

reversed, modified or vacated ... such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Proponents' receipt of written notice of any such order. Notwithstanding any such reversal, modification or vacatur of this Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Order prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Order and the Plan ....

ther, they argue that even if all potentially affected creditors were given adequate notice, not all of them are parties to the appeal and it would be impracticable for all of them to participate in the appeal.[58]

I find that Appellees' arguments are persuasive on this point. In each case relied upon by Appellants, the "relevant parties" were before the Court.[59] That is not the situation here. As discussed above, the only equitable implementation of a disgorgement remedy would be to order disgorgement from all affected creditors, not merely from the select few designated by Appellants. Thus, all creditors are potentially at risk and should be parties. Appellants fail to explain how and why all of those creditors—each of whom received unencumbered distributions under the Plan and very well may no longer be within the reach of the Court's jurisdiction [60]—are sufficiently on notice that their distributions are vulnerable to disgorgement on appeal.[61] Indeed, that was one of the concerns expressed by the court in *Chateaugay I*, where the Second Circuit stated that "[c]ompleted acts in accordance with an unstayed order of the bankruptcy court must not thereafter be routinely vulnerable to nullification if a plan of reorganization is to succeed." [62]

### 5. Whether Appellants Pursued a Stay with Diligence

Appellants did seek a stay in this Court pending their appeal of the Confirmation Order. This Court granted the stay, but conditioned it upon Appellants' posting of a substantial bond. Although the Court set the bond at $1.3 billion, Appellants were given numerous opportunities—before this Court, before the Second Circuit, and once again before this Court—to offer an alternative bond amount, so long as that amount was substantial and reflected the grave harm that the estate stood to suffer as a result of the stay during the pendency of an appeal. Appellants' only offer was $10 million, which amounted to a complete refusal to post a reasonable bond.

■ Refusal to post a bond that a court requires as a condition to obtaining a stay pending appeal constitutes a "failure to seek a stay diligently" under the fifth *Chateaugay* factor.[63] A significant bond in this case was necessary in order to protect the estate and third parties in the event of an unsuccessful appeal.[64] Again, it is important to note that Appellants never attempted to demonstrate that they were "unable (rather than unwilling)" [65] to post a reasonably substantial bond. Rather, they simply did not view it as a prudent investment. But their business decision not to post a bond—even a substantially reduced bond on the order of $250 million, which represents Appellants' potential upside—was made at their peril. To permit a party to avoid mootness merely by pursuing a stay that they never intended to

---

58. *See* Appellees' Mootness Mem. at 18 n.18 (citing *Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 890 (S.D.N.Y.1994)).

59. Appellants' Mootness Mem. at 12.

60. *See supra* Part III.B.1.

61. The Court declines Appellants' invitation to fix the notice deficiencies by undertaking to provide all creditors with notice of the appeal. *See* Appellants' Mootness Mem. at 12.

62. 988 F.2d at 326.

63. *In re National Rests. Mgmt., Inc.*, Nos. 00 Civ. 6624, 00 Civ. 6625, 2001 WL 220023, at *5 (S.D.N.Y. Mar.7, 2001).

64. *See In re Adelphia Commc'ns Corp.*, 361 B.R. at 367.

65. *In re Adelphia Commc'ns Corp.*, 361 B.R. at 346.

bond would be grossly inequitable and would swallow the fifth *Chateaugay* factor. Thus, the fifth factor favors dismissal of this appeal on mootness grounds.

In sum, Appellants fail to establish four of the five *Chateaugay* factors and thus, cannot overcome the presumption of equitable mootness stemming from substantial consummation of the Plan. Even apart from the precise application of each of the *Chateaugay* factors in this case, the essence of the equitable mootness doctrine is to prevent appeals from going forward in cases where granting relief, even where hypothetically possible, would be inequitable. This is one of those cases. Accordingly, this appeal of the Confirmation Order must be dismissed as moot.[66]

## IV. CONCLUSION

For the reasons discussed above, the appeal is dismissed as equitably moot. The Clerk of the Court is directed to close this appeal.

**SO ORDERED.**

---

66. The Bankruptcy Court predicted this very result. *See* Bench Dec. at 253 (analyzing the irreparable harm to the moving party factor: "I assume it to be true that if a stay isn't granted, the Plan will go effective, and that if that happens, there is a very high probability that any appellate court would then find an appeal to be moot.").