# In re ADELPHIA COMMUNICATIONS CORPORATION, et al., Debtors.

### Official Committee of Equity Security Holders of Adelphia Communications Corporation, Appellant,

v.

### Adelphia Communications Corporation, et al., Appellees.

### Nos. 02–41729, 07 Civ. 1018(SAS).

United States District Court, S.D. New York.

May 17, 2007.

Peter D. Morgenstern, Gregory A. Blue, Eric B. Fisher, Morgenstern Jacobs & Blue LLC, New York, New York, for Appellant.

Myron Trepper, Brian E. O'Connor, Rachel C. Strickland, Brian P. Guiney, Wilkie Farr & Gallagher LLP, New York, New York, for Appellees Reorganized Debtors.

David M. Friedman, Adam L. Shiff, Michael C. Harwood, Kasowitz, Benson, Torres & Friedman LLP, New York, New York, for Appellee Official Committee of Unsecured Creditors.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

The present dispute arises out of the approximately 230 jointly administered chapter 11 cases of Adelphia Communications Corporation ("ACC") and its subsidiaries (collectively, the "Debtors"). The Official Committee of Equity Security Holders (the "Equity Committee") appeals from the Bankruptcy Court's confirmation order (the "Confirmation Order") approving the First Modified Fifth Amended Joint Chapter 11 Plan (the "Plan").[1] By Consent Order dated January 23, 2007, the Equity Committee withdrew its motion for an emergency stay of the Plan, agreeing that if the Plan went effective it would be without prejudice to the appeal the Equity Committee now brings.[2]

The Equity Committee urges that the Confirmation Order be vacated, in relevant part, on the following five grounds: (1) the Bankruptcy Court lacked jurisdiction over the claims being asserted by the Equity Committee (the "Equity Committee Claims") because the District Court had withdrawn its reference of these claims to the Bankruptcy Court; (2) the Debtors

---

1. *See* Bankruptcy Court Bench Decision on Confirmation, dated January 3, 2007 ("Bench Dec."), Exhibit ("Ex.") R to the Declaration of Eric B. Fisher, counsel for Appellant ("Fisher Decl.").

2. *See* 1/23/07 Consent Order, Ex. U to Fisher Decl., ¶ 2 (providing that, notwithstanding provisions of the Plan providing for the Equity Committee's termination, the Equity Committee shall remain in existence for several limited purposes, including the prosecution of its appeal of the Confirmation Order). On January 24, 2007, this Court granted a stay of the Plan pending appeal by the ACC Bond-

holder Group, ("ACC Bondholders"), which was then vacated by this Court on February 12, 2007, due to the failure of the ACC Bondholders to post a reasonable bond, thereby permitting the Plan to go effective. *See In re Adelphia Commc'ns Corp. ("In re Adelphia I")*, 361 B.R. 337 (S.D.N.Y.2007) (granting the stay subject to the posting of a bond), *appeal dismissed*, No. 07–0279–bk (2d Cir. Feb. 9, 2007). *See also In re Adelphia Commc'ns Corp. ("In re Adelphia II")*, 367 B.R. 84 (S.D.N.Y.2007) (ultimately dismissing the ACC Bondholders' appeal of the Confirmation Order as equitably moot).

lacked the authority to transfer those claims to the Plan's litigation trust, the Contingent Value Vehicle ("CVV"); (3) the Bankruptcy Court committed reversible error by allowing for the "*de facto* substantive consolidation*" of litigation claims in the CVV,[3] the proceeds of which will be distributed to creditors with "no legitimate right to those proceeds;"[4] (4) the Plan impermissibly deprives the Equity Committee of its right to prosecute its own objection to the claims of the Debtors' pre-petition lenders; and (5) the Bankruptcy Court committed reversible error by ignoring conflicts of interest inherent in the CVV's governance provisions.

In some sense, these five issues boil down to one main—and novel—question: Did the Bankruptcy Court commit reversible error when it effectively withdrew the Equity Committee's derivative standing to pursue litigation against ACC's pre-petition lenders and investment banks on behalf of the estate? The Bankruptcy Court conferred this standing on the Equity Committee, upon its uncontested motion, in August 2005 ("*Standing Decision*").[5] In that decision, the Bankruptcy Court concluded that although the "ultimate progno-

sis" for the claims proposed by the Equity Committee was not "particularly optimistic," allowing them to go forward would be in the estates' best interest at that time.[6] For all intents and purposes, the Bankruptcy Court withdrew this standing in its January 3, 2007 Bench Decision, stating "[t]he Equity Committee served responsibly and well. But now its job is done."[7] Although neither party attacks head on the question of whether such a withdrawal was an appropriate exercise of the Bankruptcy Court's equitable authority, it is necessary to do so here in order to decide the issues raised by this appeal.[8]

The Debtors and the Creditors Committee (together, "Proponents") filed a joint brief in opposition to the Equity Committee's appeal.[9] For the reasons discussed below, the Bankruptcy Court's withdrawal of the Equity Committee's derivative standing was not an abuse of discretion.

## I.  LEGAL STANDARD

### A.  Appeals of Bankruptcy Court Orders

■ The district courts are vested with appellate jurisdiction over bankruptcy

---

3.  This litigation, known as the "Bank Litigation," encompasses claims brought by the Debtors, the Official Committee of Unsecured Creditors appointed in the Debtors' cases (the "Creditors Committee") and the Equity Committee, against the Debtors' pre-petition lenders and investment banks (collectively, the "Banks").

4.  Brief of Appellant the Official Committee of Equity Security Holders of Adelphia Corporation ("Equity Mem.") at 31.

5.  *See In re Adelphia Commc'ns Corp. ("Standing Dec."),* 330 B.R. 364, 386 (Bankr.S.D.N.Y. 2005).

6.  *Id.* at 385.

7.  Bench Dec. at 240. *See also* Equity Mem. at 3 ("Most egregiously, the Plan divests the Equity Committee of its control over multi-

billion dollar litigation claims ...."); *id.* at 19 ("[T]he Bankruptcy Court approved a plan of reorganization that dissolved the Equity Committee and deprived ACC's equity holders of any continuing control over the Equity Committee Claims.").

8.  This Opinion assumes familiarity with the facts summarized in the Bankruptcy Court's Bench Decision. Of particular relevance are the portions of that decision discussing the purpose of the CVV, *see* Bench Dec. at 45–57, and the Bankruptcy Court's rejection of the Equity Committee's objections to confirmation of the Plan, *see id.* at 232–40.

9.  *See* Plan Proponents' Brief in Opposition to the Equity Committee's Opening Brief ("Proponents' Mem.").

court rulings.[10] Final orders of the bankruptcy court may be appealed to the district court as of right.[11] An order is final if "[n]othing in the order . . . indicates any anticipation that the decision will be reconsidered." [12] Courts have held that an order confirming a plan of reorganization is final.[13]

## B. Standard of Review

■ A district court functions as an appellate court in reviewing judgments rendered by bankruptcy courts.[14] Findings of fact are reviewed for clear error.[15] A finding of fact is clearly erroneous if the court is " 'left with the definite and firm conviction that a mistake has been committed.' " [16] If the bankruptcy court's factual findings are "plausible in light of the rec-ord viewed in its entirety," this court "may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." [17] A bankruptcy court's conclusions of law, by contrast, are reviewed de novo.[18]

■ Whether a party should be granted derivative standing is a mixed question of law and fact.[19] Because "the ability to confer derivative standing upon . . . committees is a straightforward application of bankruptcy courts' equitable powers," [20] the decision to confer standing is reviewed for an abuse of discretion.[21] By the same token, a bankruptcy court's decision to

---

10. *See* 28 U.S.C. § 158(a).

11. *See id.* § 158(a)(1).

12. *In re Palm Coast, Matanza Shores Ltd. P'ship*, 101 F.3d 253, 256 (2d Cir.1996).

13. *See In re Worldcom, Inc.*, No. M–47, 2003 WL 21498904, at *5 (S.D.N.Y. June 30, 2003). In any event, the parties do not dispute that the Bankruptcy Court's Confirmation Order and denial of a further stay is final.

14. *See In re Sanshoe Worldwide Corp.*, 993 F.2d 300, 305 (2d Cir.1993) ("[Appellant] relies on several cases for the reasonable proposition that the district court acts as an appellate court in reviewing a bankruptcy court's judgments.").

15. *See* Fed. R. Bankr.P. 8013 ("Findings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."). *Accord In re Cody, Inc.*, 338 F.3d 89, 94 (2d Cir.2003).

16. *In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1388 (2d Cir.1990) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). *Accord In re Vogel Van & Storage, Inc.*, 59 F.3d 9, 12 (2d Cir.1995).

17. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

18. *See In re Cody*, 338 F.3d at 94; *In re 139–141 Owners Corp.*, 313 B.R. 364, 367 (S.D.N.Y.2004).

19. *See Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes*, 779 F.2d 901, 905–06 (2d Cir.1985).

20. *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery ("Chinery")*, 330 F.3d 548, 567–69 (3d Cir.2003). The bankruptcy court's equitable power, " 'conferred . . . by section 105(a) [of the Bankruptcy Code],' " " 'is the power to exercise equity in carrying out the *provisions* of the [ ] Code, rather than to further the purposes of the Code generally, or otherwise to do the right thing.' " *In re Smart World Techs., LLC*, 423 F.3d 166, 184 (2d Cir.2005) (quoting *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 91–92 (2d Cir.2003)).

21. *See In re Aquatic Dev. Group, Inc.*, 352 F.3d 671, 673 (2d Cir.2003). *Accord In re Yadidi*, 274 B.R. 843, 847 (9th Cir.BAP2002) ("The application of § 105 power is reviewed for abuse of discretion.").

withdraw derivative standing is reviewed for an abuse of discretion.[22] In reviewing the Bankruptcy Court's decision, the Court remains mindful that a bankruptcy court abuses its discretion by failing to make findings necessary to the proper exercise of its discretion, and that a bankruptcy court's reliance on erroneous conclusions of law is itself an abuse of discretion.[23]

### C. Derivative Standing Under the STN Trilogy

The *Standing Decision* offers a thorough and accurate recitation of this Circuit's derivative standing doctrine.[24] However, because that decision predated (by less than two weeks) the Second Circuit's ruling in *In re Smart World Technologies, LLC* ("*Smart World*"),[25] of which the parties offer conflicting interpretations, I briefly summarize relevant case law below.

Three seminal cases in this Circuit laid the foundation for committees to acquire derivative standing to press claims on behalf of debtors' estates. They are: (i) *Unsecured Creditors Committee of Debtor STN Enterprises, Inc. v. Noyes* ("*STN*");[26] (ii) *In re Commodore International, Ltd.* ("*Commodore*");[27] and (iii) *In re Housecraft Industries USA, Inc.* ("*Housecraft*")[28] (collectively, the "*STN Trilogy*"). The Second Circuit first recognized the doctrine of derivative standing in *STN*. There, the court held that although "no explicit authority for creditors' committees to initiate [suit]" exists in the Code, an "implied, but qualified" right exists under 11 U.S.C. §§ 1103(c)(5) and 1109(b) in cases where the debtor-in-possession has "unjustifiably" failed to bring suit and a committee seeking standing obtains the approval of the court.[29] In *Commodore*, the court extended the doctrine of derivative standing to apply in cases where the debtor-in-possession consents to a committee's maintenance of the claim.[30] Finally, in *Housecraft*, the court held that bankruptcy courts may grant standing to a committee to sue as a co-plaintiff with the debtor-in-possession on behalf of the estate.[31]

---

22. *See In re Lionel Corp.*, 722 F.2d 1063, 1069 (2d Cir.1983) ("To further the purposes of chapter 11 reorganization, a bankruptcy judge must have substantial freedom to tailor his orders to meet differing circumstances.").

23. *See In re Aquatic*, 352 F.3d at 678 (defining abuse of discretion "as (i) a decision 'rest[ing] on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding,' or (ii) a decision that, 'though not necessarily the product of a legal error or a clearly erroneous factual finding[,] cannot be located within the range of permissible decisions' " (quoting *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir.2001))). *See also In re Blaise*, 219 B.R. 946, 950 (2d Cir. BAP 1998) ("A bankruptcy court also abuses its discretion if the reviewing court has a definite and firm conviction that the lower court committed a clear error of judgment in the conclusion it reached." (citation omitted)).

24. *See Standing Dec.*, 330 B.R. at 372–77.

25. 423 F.3d 166.

26. 779 F.2d 901.

27. 262 F.3d 96 (2d Cir.2001).

28. 310 F.3d 64 (2d Cir.2002). Hereafter, I refer colloquially to the derivative standing granted under these cases as "*STN* standing."

29. 779 F.2d at 904. A bankruptcy court exercises its section 105 equitable power to confer derivative standing in order to carry out sections 1103(c)(5) and 1109(b) of the Code. *See Smart World*, 423 F.3d at 184 (a bankruptcy court's exercise of equitable authority must " 'be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective' " (quoting *In re Dairy Mart*, 351 F.3d at 91–92)).

30. *See* 262 F.3d at 100.

31. *See* 310 F.3d at 71.

A court entertaining a derivative standing motion governed by the *STN Trilogy* must inquire, "in the first instance," into the committee's "probabilities of legal success and financial recovery in event of success."[32] The "court need [not] undertake a mini-trial," but "should assure itself that there is a sufficient likelihood of success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce."[33] Additionally, where the debtor-in-possession's failure to bring suit has *not* been found to be "unjustifiable" under *STN*, a court granting derivative standing to a committee must "find[ ] that suit by the committee is (a) in the best interests of the bankruptcy estate, and (b) is 'necessary and beneficial' to the fair and efficient resolution of the bankruptcy proceedings."[34] This "approach permit[s] a reasoned and practicable division of labor between the creditors committee and the debtor in possession or trustee, while also providing bankruptcy courts with significant authority to both manage the litigation and to check any potential for abuse by the parties."[35]

It follows from the reasoning of the *STN Trilogy* that a bankruptcy court may exercise its equitable power to withdraw derivative standing if the court concludes that maintenance of the litigation being pursued by a committee no longer meets the test outlined above (*i.e.*, that allowing the litigation to continue would be detrimental to either the estate's best interest, or to the fair and efficient resolution of the bankruptcy proceeding). This result is also supported by the Second Circuit's characterization of derivative standing in *Commodore* as the right to "sue on behalf of the debtors, with the approval and supervision of a bankruptcy court."[36]

## II. DISCUSSION

### A. Withdrawal of the District Court's Reference

As a threshold issue, the Equity Committee contends, as it did below, that the Bankruptcy Court lacked jurisdiction to transfer the Equity Committee Claims to the CVV, or to substitute the CVV's trustees as nominal plaintiffs with respect to those claims, because the District Court's reference of the Bank Litigation to the Bankruptcy Court had been withdrawn.[37] In response to this argument, the Bankruptcy Court observed that the

---

**32.** *STN*, 779 F.2d at 905. As the Bankruptcy Court noted in its standing decision, "[n]either *Commodore* nor *Housecraft* speaks to the likelihood of success that [is] required to pass muster. *STN* required the claims to be 'colorable,' and that expression has repeatedly been used in articulating the appropriate standard on both *STN* and *Commodore/Housecraft* motions." *Standing Dec.*, 330 B.R. at 376. Thus, the Bankruptcy Court used the baseline "colorable claim" standard in evaluating the Equity Committee's proposed litigation. *See id.* at 385–86.

**33.** *STN*, 779 F.2d at 905–06.

**34.** *Standing Dec.*, 330 B.R. at 374 (quoting *Commodore*, 262 F.3d at 100). *Accord Housecraft*, 310 F.3d at 71 (same).

**35.** *Standing Dec.*, 330 B.R. at 374 (citing *Commodore*, 262 F.3d at 100).

**36.** 262 F.3d at 100. The term "supervision" implies that bankruptcy courts have a responsibility to oversee a standing committee's prosecution of claims brought on behalf of the estate, and to intervene or alter the committee's role when necessary. *See also In re Lionel Corp.*, 722 F.2d at 1069 ("[A] bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code.... Some play must be allowed for the joints of the machine." (quotations and citation omitted)).

**37.** *See* Equity Mem. at 16.

District Court's withdrawal of the reference ("Withdrawal Decision"),[38] "gave the district court the responsibility for *adjudicating [the merits of]* the remainder of the Bank Litigation ... but it did not address the estate's *ownership* of its existing claims." [39]

The Equity Committee argues that the Withdrawal Decision stripped the Bankruptcy Court of jurisdiction over *"all* aspects of the Bank Litigation." [40] That reading, however, is overbroad and has serious implications beyond this appeal. Although it offers a "bright line rule that is easy to announce," [41] such a rule would raise endless questions (and motion practice) regarding whether a matter in the Bankruptcy Court affects the Bank Litigation and therefore must be heard in the District Court.[42] Applying this standard would cause unnecessary delay and cause strain on limited judicial resources.

Moreover, the Withdrawal Decision reveals that the District Court understood that the chapter 11 plan then being considered would create a "Contingent Value Vehicle which w[ould], upon confirmation, prosecute litigation on behalf of the Debtors, including the adversary proceeding here under consideration." [43] Nowhere did the District Court indicate that such a vehicle (which obviously would affect the Bank Litigation directly) would be inappropriate or require special approval, or that the Bankruptcy Court would lack the requisite jurisdiction to confirm the plan. Thus, the Equity Committee's threshold jurisdictional argument is unavailing.

## B. Limitations on *STN* Standing

At the heart of this appeal is the Equity Committee's assertion that when the Bankruptcy Court granted it *STN* standing to pursue additional claims on behalf of the estate, "it vested a measure of ownership and control over those claims in the Equity Committee" and "[a]s a consequence, neither the Debtors nor other parties in interest had the right to control those claims to the exclusion of the Equity Committee." [44] The Bankruptcy Court disagreed, stating in its Bench Decision that

> [t]he Equity Committee does not, as it asserts, have 'ownership' of the Additional Bank Claims, nor must the Plan Proponents obtain the Equity Committee's consent to transfer those claims to the CVV. Citing my previous grant of standing under the *STN Trilogy*, the Equity Committee has claimed [exclusive] ownership and control over those claims.... But the additional claims it brought are estate actions that were brought on behalf of the Estates. The *STN Trilogy* speaks to when a party

38. *See* Memorandum and Order ("Withdrawal Dec."), 03 MDL 1529, at 6, 11–12 (S.D.N.Y. Feb. 9, 2006), Ex. H to Fisher Decl.

39. Bench Dec. at 233–34 (emphasis added).

40. Equity Mem. at 18.

41. Proponents' Mem. at 24.

42. Proponents offer several examples of open questions that demonstrate this point. For "having withdrawn the reference with the Bank Litigation ... must the district court [now] sit in lieu of the Bankruptcy Court for purposes of [ (i) ] determining the proper amount of [a litigation fund] established pursuant to the Plan as a reserve for the payment of the Banks' claims for fees;" or (ii) ruling on objections to the Plan filed by defendants in the Bank Litigation; or (iii) deciding a motion to disband the Equity Committee? *Id.* at 24–25. Such questions weigh heavily against finding that the District Court intended to exercise exclusive jurisdiction over any proceeding affecting the Bank Litigation.

43. Withdrawal Dec. at 9.

44. Equity Mem. at 12–13.

other than a trustee or debtor may bring an estate cause of action. At least as a general matter, it does not strip a debtor of standing.[45]

For the reasons stated below, this conclusion of law is sound. The Bankruptcy Court's reliance on this conclusion as a basis for withdrawing the Equity Committee's *STN* standing and confirming the Plan over the Equity Committee's objections fell within the court's discretion.

Relying on the Second Circuit's decision in *Smart World*, the Equity Committee argues that the Bankruptcy Court misapplied Circuit law.[46] According to the Equity Committee, *Smart World* "shows that an order pursuant to the *STN–Commodore–Housecraft* line of cases granting a committee standing *effectively shifts* ownership and control of the claims from a debtor to an official committee."[47] This is an overstatement of *Smart World's* holding. Moreover, both the tenor and plain language of *Smart World* advance respect for a debtor-in-possession's right to manage the estate, and for the role of the bankruptcy court in determining whether allowing a committee to initiate claims on behalf of a debtor would maximize the value of the estate.

### 1. *Smart World*

■ In *Smart World*, the Second Circuit reversed a bankruptcy court's decision to confer derivative standing on creditors who wished to settle an adversary proceeding over the objections of the chapter 11 debtor-in-possession.[48] The Circuit found the grant of derivative standing inappropriate on several grounds, including the fact that the record below contained little more than "conclusory statement[s]" that the legal claims the debtor wished to continue prosecuting "lacked viability," were premised on the " 'unrealistic hope that continued litigation would be ... wildly successful,' "[49] and could be dismissed out of hand as mere "equity gambling."[50] The Circuit concluded that the grant of derivative standing had unlawfully stripped the debtor-in-possession of its inherent authority to control the bankruptcy estate. In the absence of *STN* standing, the creditors had a right under section 1109(b) of the Code to intervene in the adversary proceeding (*i.e.*, to appear and be heard) but that pursuant to Federal Rule of Bankruptcy Procedure 9019 "the debtor-in-possession [possessed] sole authority to bring a motion to settle or compromise" that proceeding.[51]

Despite its distinguishable facts, the Equity Committee hangs its hat on a single paragraph of *Smart World*. Ironically, this paragraph quoted and endorsed conclusions of law issued by the same bankruptcy court from which the Equity Committee now appeals. The Second Circuit stated:

> [I]n *In re Adelphia Communications Corp.*, the bankruptcy court granted the

---

**45.** Bench Dec. at 234 (quotations and citations omitted).

**46.** During a colloquy with the Court, the Equity Committee admitted that *Smart World* is "the best [it] can do" in terms of finding support in the case law for the proposition that a bankruptcy court lacks the power to withdraw *STN* standing previously granted. 1/17/07 Oral Argument Transcript ("Tr.") at 16–17.

**47.** Equity Mem. at 23 (emphasis added).

**48.** *See* 423 F.3d at 177.

**49.** *Id.* (quoting *In re Smart World*, No. 03 Civ. 9467, 2004 WL 1118328, at *3 (S.D.N.Y. May 19, 2004)).

**50.** *Id.* (referring to the bankruptcy court's characterization of the claims).

**51.** *Id.* at 182.

creditors' committees' motion to intervene, but "took under advisement exactly what the Committees' rights as a consequence of [*In re Caldor*, 303 F.3d 161 (2d Cir.2002)] would be." After observing that *Caldor* had not overruled *STN*, the [bankruptcy] court ultimately concluded that § 1109(b) entitled the creditors to "standing to raise issues and to appear and be heard," but that the right did *"not equate to ownership* of the causes of action in question." *In order to "secure the latter,"* the court noted that *the creditors would have to meet the standard for derivative standing under STN....* We agree with the reasoning of *Adelphia....*[52]

The Equity Committee reads this in isolation to imply that upon a grant of *STN* standing, ownership of a claim transfers from the debtor-in-possession to a committee. The missing context, however, is critical. Following this discussion of *Adelphia*, the Second Circuit went on to explain that the reason why section 1109(b) cannot be "construed as giving creditors the unilateral right to take control of the estate's legal causes"[53] is because such a construction runs contrary to *"numerous* provisions of the Bankruptcy Code establishing the debtor's authority to manage the estate and its legal claims."[54] Time and again, throughout *Smart World*, the Second Circuit emphasized the superior role

the Code assigns to a debtor-in-possession to act "as legal representative and fiduciary of the estate."[55] This principle underpinned the Circuit's decision in *Smart World*, and it underpins my decision here.

*Smart World* directs that in the absence of *STN* standing, a committee lacks the authority to settle litigation on behalf of a debtor-in-possession without the latter's consent. But nowhere does *Smart World* suggest that the inverse is true—that where derivative standing *does* exist, a debtor-in-possession is irreversibly stripped of its authority to settle that litigation absent the consent of the standing committee. *Smart World* did not hold that a committee's derivative standing forever trumps the rights of a debtor-in-possession, so that the latter may never gain control of that litigation. Rather, *Smart World* confirms repeatedly that it is the fundamental responsibility of the debtor-in-possession to manage the estate.[56]

It is important to understand that the Bankruptcy Court's decision to confer derivative standing on the Equity Committee was *not* "based on a perception that the Debtors or their counsel had failed to bring the additional claims for any reason that might have been deemed to be inappropriate."[57] The only parties opposing the Equity Committee's motion for derivative standing were defendants in the litigation the Equity Committee sought to pros-

---

**52.** *Id.* at 182–83 (quoting 285 B.R. 848, 850 (Bankr.S.D.N.Y.2002)) (emphasis added).

**53.** *Id.*

**54.** *Id.* at 174 (emphasis added) (citing sections 362(a)(3) and 323 of the Code). For example, section 362(a)(3) "allows the debtor-in-possession to take control of the estate's property in order to assure an equitable distribution of the property among creditors," and thus *"evinces Congress's desire to leave administration of the chapter 11 estate solely in the hands of the debtor-in-possession." Id.*

(emphasis added) (quotations and citations omitted).

**55.** *Id.* at 183 (citing sections 323, 1107 and 1106(a)(1) of the Code).

**56.** Even less persuasive is the idea that *Smart World* permits a committee with derivative standing to override the rights of debtors—such as the Debtors here—whose decision to not pursue the claims in issue was *not* found to be "unjustifiable" under *STN*.

**57.** Bench Dec. at n. 319.

ecute.[58] For this reason, the Bankruptcy Court noted that notwithstanding the Equity Committee's treatment of its own motion as an *STN* motion, the facts were more akin to "a *Commodore*, rather than *STN* [ ] situation."[59] This is not a distinction without a difference. The Second Circuit has emphasized the difference between a debtor-in-possession whose conduct is unjustifiable or unreasonable (an *STN* situation), and a debtor-in-possession whose conduct is "less likely antithetical to the interests of the estate" (a *Smart World, Commodore* or *Housecraft* situation).[60] In accordance with the underlying purpose of derivative standing, "a party who seeks to displace the debtor faces a heavier burden in the [latter] case than in the [former]."[61] The Equity Committee has never satisfied this burden. *Smart World* thus supports the proposition that a debtor-in-possession may assert control over an adversary proceeding notwithstanding a committee's derivative standing, where that standing was granted for reasons other than debtor misconduct.

The Bankruptcy Court granted the Equity Committee the power to initiate litigation solely because the court believed that allowing it to do so would further the estates' best interests. "Reading the Code

as a whole,"[62] as I must, this ability to control the additional claims never vested the Equity Committee with ownership of them. At all times, it remained within the court's discretion to rescind that control upon concluding that it had become antithetical to the estates' best interests. So long as the Bankruptcy Court did not abuse its discretion in deciding to withdraw the Equity Committee's standing under the facts and circumstances of this case, the Confirmation Order was not predicated on legal error in this respect.

## 2. Exercise of Discretion

After reviewing the factual record in this case, as well as the Bankruptcy Court's two pertinent decisions—the *Standing Decision* and Bench Decision—I find that the Bankruptcy Court did not abuse its discretion in withdrawing the Equity Committee's *STN* standing.

■ The record demonstrates that with respect to the Equity Committee, the Bankruptcy Court acted in the best interests of the estates at each turn and "leaned over backward ... to give the Equity Committee a fair shot at maximizing value in [the Bank Litigation], and to ensure that value wasn't unfairly taken

---

58. *See Standing Dec.,* 330 B.R. at 368.

59. *Id.*

60. *Smart World,* 423 F.3d at 177.

61. *Id.* Now that the Debtors vigorously oppose the Equity Committee's right to control litigation, the origins of the derivative standing doctrine are particularly relevant, for they highlight the diminished utility of a committee's derivative standing in situations where (i) a debtor-in-possession subsequently decides to object to a committee's standing, and (ii) the debtor-in-possession has never been found to be acting contrary to the estate's best interests. *See STN,* 779 F.2d at 901 (noting that "derivative standing in the bankruptcy context is analogous to derivative standing in

shareholder suits," and thus presupposes that a debtor has "unjustifiably" failed to bring suit); *Chinery,* 330 F.3d at 579 (derivative standing appropriate where a "debtor unreasonably refuses to pursue" a fraudulent transfer action); *In re Xonics Photochem., Inc.,* 841 F.2d 198, 203 (7th Cir.1988) (indicating that in order to obtain derivative standing, a party must "convince the court that [a] debtor [is] shirking his statutory responsibilities"); *In re The Gibson Group, Inc.,* 66 F.3d 1436, 1438 (6th Cir.1995) (derivative standing requires, *inter alia,* that a debtor-in-possession has unjustifiably refused to prosecute litigation).

62. *Smart World,* 423 F.3d at 183.

away from it by senior classes."[63] However, after four years of supervising this bankruptcy, the court concluded that "unless there's a grand slam home run in the litigation pursued by the CVV, *it is beyond rational dispute that the holders of the Equity interests are out of the money.*"[64] Specifically, the Bankruptcy Court found that "[f]or value to pour down all the way to equity, the CVV would have to recover at least $6.5 billion," and that this was "an ambitious goal ... so ambitious that it could fairly be said that equity is hopelessly out of the money."[65]

The Equity Committee disputes this bleak prognosis and argues that given the magnitude of the litigation claims, once the "illegal allocation scheme" provided for by the CVV is corrected, "the true differential before equity holders are 'in the money' is likely less than half the amount asserted by the Plan Proponents."[66] All of the Equity Committee's arguments in this regard presuppose that the Equity Committee had obtained, though its *STN* standing, inalienable oversight of the claims it brought on behalf of the estate. As discussed above, this is not the case, because the Equity Committee Claims have always

been *derivative* claims belonging to the Debtors (who were never stripped of their inherent standing to settle those claims), and because the Bankruptcy Court retained discretionary authority to withdraw the Equity Committee's standing upon concluding that doing so would be in the best interests of the estates.

The *Standing Decision* reveals that the Bankruptcy Court granted the Equity Committee *STN* standing based on several overlapping factors, including the Debtors' lack of opposition, and deference to the Second Circuit's repeated direction, throughout the *STN Trilogy*, that courts considering *STN* standing motions focus on the best interests of the estate. Against this backdrop, the Bankruptcy Court conducted a thorough analysis of the Equity Committee Claims, and noted that although some of them were likely to expire at the motion to dismiss or summary judgment stage, others were "at least colorable" and therefore satisfied *STN*.[67] The court also observed that the Equity Committee could prosecute the additional claims at a relatively low cost to the estates.[68] Ultimately, the court concluded that the question of whether conferring

---

63. Bench Dec. at 240.

64. *Id.* at 238 (emphasis added).

65. *Id.* at 233. *See also* Proponents' Mem. at 5–9.

66. Reply Brief of Appellant the Official Committee of Equity Security Holders of Adelphia Communications Corporation ("Equity Reply Mem.") at 12. Under the Plan, proceeds from litigation entrusted to the CVV will be distributed to creditors according to the Plan's priority scheme. The Equity Committee asserts that the Bankruptcy Court "should not have confirmed a Plan that makes no findings of who owns what claims, and then distributes litigation recoveries to creditors who are not entitled to them." Equity Mem. at 34. Even assuming this argument has

merit, the Equity Committee lacks standing to press this issue on appeal because it does not own any claims included in the CVV. *See infra* Part II.C.

67. *Standing Dec.,* 330 B.R. at 384–85.

68. In weighing the costs and benefits of granting the Equity Committee *STN* standing, the Bankruptcy Court wrote: "As the Equity Committee fairly observes, its motion does not present the Court with the more common cost-benefit analysis where the cost of an independent full-blown litigation must be analyzed. Here the Court must [only] consider the *incremental* cost of permitting the Equity Committee to pursue the additional claims it wishes to assert. And here the incremental cost of prosecuting the Equity Committee's claims will be small...." *Id.* at 385–86.

standing on the Equity Committee would be in the best interests of the estates was a "close" call.[69] Nevertheless, assessing the totality of the circumstances at the time, the court concluded that permitting the Equity Committee to bring claims that otherwise would not have been pursued, would indeed be in the best interests of the estates.

Seventeen months later, the court was no longer convinced. In deciding to withdraw the Equity Committee's *STN* standing, the court engaged in another "best interest test," predicated on the changed factual circumstances. By January 2007, on the eve of Plan confirmation, the cost of allowing the Equity Committee to continue prosecuting its claims could no longer be considered "incremental."[70] This is due partly to the fact that because the Equity Committee is so far out of the money, it would have an inherent conflict of interest in controlling any litigation against the banks.[71] Indeed, given the order of priority for recoveries, the Equity Committee would "always hav[e] the incentive to do nothing but swing for the fences."[72] Additionally, the Equity Committee's own constituents voted overwhelmingly in favor of the Plan.[73] Lastly, the Bankruptcy Court

---

**69.** *Id.* at 369. In evaluating the strength of the Equity Committee's proposed claims, the Bankruptcy Court, in its *Standing Decision*, made no findings of disputed facts. *Id.* (citing *STN* for the proposition that a court is not required to conduct a "mini-trial or evidentiary hearing" for the purpose of deciding an *STN* standing motion (quotations and citation omitted)). Nevertheless, the court's factual discussion surpassed the degree of scrutiny required under *STN*, for "in an excess of caution," the court engaged in a review of disputed facts. *Id.*

**70.** *See* Bench Dec. at 236–37 (stating that the Equity Committee's argument for ultimate control over the additional claims "disregards the collaborative basis on which [it] was granted derivative standing in the first place," and that "the Equity Committee's earlier assertions and assurances [that its prosecution of additional claims would only be of incremental cost] are inconsistent with its present claim of 'exclusive standing'"). Of course, because the Equity Committee is a statutory committee, it is entitled to reimbursement for fees and expenses pursuant to section 503 of the Code. Thus, the cost of permitting the Equity Committee to control claims that the Debtors may otherwise abandon or settle would continue to deplete the assets of the estates. *See* Consent Order ¶ 5 (providing for the Debtors to pay the reasonable fees and expenses of the Equity Committee in connection with, *inter alia*, this appeal).

**71.** Insofar as the Bankruptcy Court's legal conclusions encompass factual elements, the Court reviews those underlying findings of fact for clear error. *See In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 116 (2d Cir. 2000).

**72.** Tr. at 53–54 (counsel for Proponents). The Bankruptcy Court also focused on the fact that on the Plan's Effective Date, the CVV Interests in issue would have only speculative value. Accordingly, in weighing the costs and benefits to the estate of confirming the Plan, the court placed less priority on those potential recoveries than on the value to the estates of permitting the Plan to become effective as soon as practicable. Both reason and case law support the Bankruptcy Court's weighing of this factor in considering whether withdrawal of the Equity Committee's standing would be in the best interests of the estates. *See, e.g., In re Kentucky Lumber Co.*, 860 F.2d 674, 675 (6th Cir.1988) ("mere possibility" that funds would be available years after confirmation of a debtor's plan insufficient to justify award of post-petition interest to unsecured creditors); *Southern Pac. Transp. Co. v. Voluntary Purchasing Groups, Inc.*, 252 B.R. 373, 392 (E.D.Tex.2000) ("[O]nly by determining when a plan's effective date occurs can a court engage in a meaningful analysis of the best interest test."); *In re Manchester Gas Storage, Inc.*, 309 B.R. 354, 383 (Bankr. N.D.Okla.2004) ("best interests of creditors test is applicable at the time of confirmation" and not "years after confirmation").

**73.** Over ninety percent of ACC Preferred Stock Interests and over ninety percent of ACC Common Stock Interests voted to accept

observed that even assuming, *arguendo*, the Equity Committee's contention that certain rights or causes of action in the Bank Litigation belonged solely to ACC—and not to other Debtors as well—ACC creditors had the prerogative to give up those rights, if they so chose, by accepting a reorganization plan.[74]

The Bankruptcy Court's withdrawal of the Equity Committee's derivative standing is not, as the Equity Committee suggests, a breakdown in the system. Rather, the Bankruptcy Court acted as "gatekeeper" to achieve a result consistent with the role of a debtor-in-possession that Congress envisioned, and both the Code and Circuit precedent "anticipate the court's means of achieving that result."[75] The Bankruptcy Court found that the interests of the estates would best be served by withdrawing the Equity Committee's standing to control causes of action owned in the first instance by the Debtors. Because no dispositive point of law or fact on which the Bankruptcy Court relied in reaching its decision to withdraw the Equity Committee's derivative standing was erroneous, that decision is affirmed.

## C. Residual Standing to Prosecute Its Objection to the Banks' Claims [76]

■ The Equity Committee argues that regardless of its *STN* standing to prosecute the additional claims against the Banks, the Plan and Confirmation Order unlawfully deprive the Equity Committee of its right to prosecute its own *objection* to claims filed by the Banks against the Debtors (the "Banks' Claims").[77] Specifically, the Equity Committee contests: (1) Section 11.1 of the Plan, which provides that only the Plan Administrator and Settlement Parties may object to Claims after the Effective Date; and (2) Paragraph twelve of the Confirmation Order which provides that

> [a]ll pending objections to the Bank Claims, including objections by the Creditors Committee and the Equity Committee [Docket Nos. 1964 and 10623] shall be deemed merged into the Bank Lender Avoidance Complaint [*i.e.*, the Bank Litigation] and subject to the terms of the Plan and the prior withdrawal of the reference with respect to said complaint.[78]

Thus, the Equity Committee attempts to preserve a role for itself in the Bank Litigation by creating a distinction between a

---

the Plan. *See* Proponents' Mem. at 9–10. Undoubtedly, they understood that "[i]n light of the projected insolvency of ACC as of the anticipated Effective Date of the Plan, the Bankruptcy Code doesn't require that *any* distribution be made to the holders of Equity Interests in ACC," and thus, if confirmed, the Plan would give "equity holders *more* than their legal entitlement." Bench Dec. at 238–39.

74. *See* Bench Dec. at 238.

75. *Chinery*, 330 F.3d at 569 (noting that "bankruptcy courts' equitable powers are most valuable" where they are used "to craft flexible remedies that, while not expressly au-

thorized by the Code, effect the result the Code was designed to obtain").

76. Specifically, the Banks have alleged claims against the estates for more than $6.8 billion in principal, plus additional amounts on account of fees and expenses, as well as additional interest and rights of indemnity. *See* Omnibus Objection of the Official Committee of Unsecured Creditors to Allowance of Claims of Bank Litigation Defendants, Ex. F to Fisher Decl., at 2.

77. *See* Equity Mem. at 37.

78. Confirmation Order ¶ 12, Ex. S to Fisher Decl.

right to pursue derivative litigation on behalf of an estate under *STN*, and an independent right to prosecute an objection against the Banks' Claims. This argument is unavailing.[79]

The Equity Committee relies on sections 502(a) and 1123(b)(3) of the Code for the proposition that it "cannot be forced to rely upon the Plan Administrator, the Creditors' Committee, the CVV Trustees, or any other person or entity to protect its interests."[80] This reliance is misplaced. Section 502(a) provides that "[a] claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a *party in interest* ... objects."[81] As a practical matter, however, because the Plan dissolves the Equity Committee, upon the conclusion of this appeal the Equity Committee will no longer exist as a party in interest, and subsection 502(a) is

therefore inapplicable.[82] Permitting the Equity Committee to prosecute its objection to the Banks' Claims notwithstanding the Plan provision providing for its dissolution would impermissibly sideline the debtor as the legal representative of the estate.[83]

And although the Equity Committee observes correctly that section 1123(b) contemplates "the continued resolution of claims objections ... *after* confirmation,"[84] nothing in that section, or any other section of the Code, prevents a reorganization plan from dissolving an official committee, thus foreclosing that committee's right to continue prosecuting an objection it previously raised under section 502(a).[85] Proponents argue, persuasively, that "[t]o adopt the Equity Committee's argument would mean that no official committee

---

**79.** As an initial matter, I note that because the objections the Equity Committee seeks to pursue so significantly mirror the claims in issue in the Bank Litigation, permitting the Equity Committee to prosecute its objections to the Banks' Claims "would effectively circumvent any finding by this Court that the transfer of the Additional Bank Claims to the CVV was proper." Proponents' Mem. at 35. *See* Equity Reply Mem. at 20 ("The grounds for the Equity Committee's objection to payment of the Banks are substantially the same as the allegations set forth in the complaint filed by the Equity Committee in the Bank Litigation.").

**80.** Equity Mem. at 38.

**81.** 11 U.S.C. § 502(a) (emphasis added).

**82.** The Equity Committee points to *In re Solutia,* No. 03–17949, 2006 WL 2640641 (Bankr. S.D.N.Y. Sept. 14, 2006), in support of its argument that it should be permitted to prosecute its own objection to the Banks' Claims regardless of whether it retains derivative standing. *See* Equity Mem. at 38–39. In *In re Solutia,* the court denied an equity committee's motion for derivative standing while affirming the committee's right to pursue its own objections to the companies' claims. *See*

2006 WL 2640641, at *1. But that case is easily distinguishable, most importantly on the ground that it does not address the rights of a committee that will be dissolved pursuant to a confirmed plan.

**83.** Although the Code does not define "party in interest," the contours of its meaning have been teased out in chapter 11 cases addressing section 1109(b) of the Code. That section provides: "A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or an indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b). *See Smart World,* 423 F.3d at 183 (declining to read section 1109(b) as "an open-ended license" for parties in interest to "take over the estate's litigation, far exceeding the role envisioned for them by Congress").

**84.** Equity Mem. at 38.

**85.** Subsection 1123(b)(3)(b) states: "Subject to subsection (a) of this section, a plan may ... provide for ... the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest...."

could ever be disbanded after it files a claims objection. That is not the law." [86]

It was within the Bankruptcy Court's discretion to approve a reorganization plan providing for the Equity Committee's pending objection to the Banks' Claims to merge into the Bank Litigation.[87] Accordingly, the Equity Committee has no inherent right to continue pursuing its own objections to the Banks' Claims.

### D. The Equity Committee's Substantive Consolidation Argument Is Equitably Moot

#### 1. The Plan's Alleged *De Facto* Substantive Consolidation

Pursuant to the Plan, proceeds from litigation contained in the CVV will be distributed to creditors according to the Plan's priority scheme, without regard to which estate's litigation generated those recoveries.[88] The Equity Committee contends, as it did below, that this allocation scheme constitutes an "improper substantive consolidation of litigation proceeds [in the CVV] for distribution to creditors who have no legitimate right to those proceeds." [89]

The Bankruptcy Court observed that the Equity Committee's argument arises from a false assumption, namely that upon a successful resolution of the claims being pursued by the Equity Committee, all recoveries would go directly to ACC. However, as the Bankruptcy Court noted, "it's a least possible, if it's not already wholly clear, that to the extent claims in the Bank Lenders Action have merit, the beneficiaries of any successful litigation would include many of the various Debtors." [90] "If it were not for the [Global] Settlement, any recoveries would have to be allocated amongst various estates, including the ACC estate." [91] This is true of the most theoretically lucrative claims asserted by the Equity Committee, which includes the Racketeer Influenced and Corrupt Organizations Act ("RICO") [92] claim alleging, *inter alia*, that a "Rigas Enterprise," consisting of Rigas Management and various banks, conspired to perpetrate a series of frauds on the Debtors, including but not limited to ACC.[93]

Even assuming, *arguendo*, that ACC has exclusive ownership of certain claims transferred to the CVV, the Equity Committee's appeal on grounds of *de facto* substantive consolidation is equitably moot because no effective relief can be fashioned without unwinding the entire Plan.

---

86. Proponents' Mem. at 32. *Cf. Kane v. Johns–Manville Corp.*, 843 F.2d 636, 642 (2d Cir.1988) (noting that "if appellate standing is not limited, bankruptcy litigation will become mired in endless appeals brought by the myriad of parties who are indirectly affected by every bankruptcy court order" (citations omitted)).

87. *See* Confirmation Order ¶ 12 (providing that upon confirmation, the Equity Committee's objections to the Banks' Claims shall be deemed merged into the Bank Lender Avoidance Complaint).

88. *See* Equity Mem. at 34 n. 68 (arguing that "[m]any of the claims being consolidated into the CVV are based on harm to the ACC parent only," and that because any recovery on these claims will go into the CVV, equity holders of the parent are unlawfully forced to "stand aside" until the creditors of other estates are paid in full).

89. *Id.* at 31.

90. Bench Dec. at 237.

91. *Id.*

92. *See* 18 U.S.C. §§ 1961–1968.

93. *See* Counts fifty-three through fifty-six of the Intervenor Complaint, Ex. D to Fisher Decl.

## 2. Equitable Mootness

In *In re Adelphia II*, this Court set forth the legal standard governing equitable mootness with respect to bankruptcy court orders confirming chapter 11 reorganization plans.[94] In short, in this Circuit, equitable mootness of an appeal of a bankruptcy court order confirming a plan is presumed when the plan has been substantially consummated during the pendency of the appeal.[95] This presumption may be rebutted upon a showing that, *inter alia*, "the court can still order some effective relief" (the "first *Chateaugay* factor"), *and* that "such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court" (the "third *Chateaugay* factor").[96]

As a defense to equitable mootness, the Equity Committee argues that the substantial consummation appeal is not equitably moot because the Court can afford full relief to the Equity Committee simply by vacating all or some of the Plan provisions concerning the CVV.[97] However, the Equity Committee makes only conclusory assertions of the availability of this remedy and offers not one whit of explanation as to how it would work in practice. Assuming this Court had the power and the inclination to vacate provisions of a reorganization plan that went effective over three months ago, the Equity Committee fails to suggest a single remedial measure, modification procedure, or alternative to the CVV. The Equity Committee's attempt to oversimplify the issue of whether effective relief remains available serves only to highlight the complexities of its appeal. As I already held in *In re Adelphia II*, which addressed the ACC Bondholder's appeal of the same alleged substantive consolidation, an effective remedy cannot be fashioned in this case.[98] As a result, the Equity Committee fails to satisfy the first *Chateaugay* factor.

Furthermore, even if vacating and modifying cherry-picked Plan provisions were available as effective relief in this case, such relief would inequitably "unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court."[99] Proponents argue, persuasively, that the overwhelming approval the Plan received from thousands of creditors was "premised on a particular allocation of value among the various constituencies in these cases. Distributions have been made, and certificates evidencing CVV Interests have been issued."[100] Vacating Plan provisions concerning the CVV would thus re-write the terms of the bargain, which is beyond the power of the Court. Additionally, the only way to vacate these provisions would be to dissolve the Global Settlement,[101] causing the entire Plan to unravel, and thus, the

---

94. *See* 367 B.R. at 91–92.

95. *See Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.) ("Chateaugay III")*, 94 F.3d 772, 776 (2d Cir.1996).

96. *Frito–Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.) ("Chateaugay II")*, 10 F.3d 944, 952–53 (2d Cir.1993).

97. *See* Equity Mem. at 18.

98. *See* 367 B.R. at 92–98.

99. *Chateaugay II,* 10 F.3d at 953.

100. Proponents' Mem. at 27.

101. *See* Equity Reply Mem. at 10 (arguing that the Global Settlement was *per se* illegitimate because the Equity Committee was excluded from participating).

Equity Committee fails to satisfy the third *Chateaugay* factor.

### 3. The Consent Order

The Equity Committee argues further that its appeal cannot be dismissed as equitably moot in light of the Consent Order entered into by the parties prior to the Plan's consummation. The Equity Committee is right in part and wrong in part.

The Consent Order provides, in pertinent part, that "[u]pon the Effective Date of the Plan, the Equity Committee Claims shall be transferred to the [CVV] in accordance with the Plan; *provided that,* the *Equity Committee Appeal shall not be rendered moot or equitably moot as a result of such transfer.*" [102] The construction of this sentence renders its plain meaning clear and unambiguous: the Consent Order preserved the Equity Committee's appellate rights as to the transfer, over its objection, of the claims it had initiated on behalf of ACC. In other words, the purpose of the provision was to ensure that notwithstanding the act of the transfer, the Equity Committee could press, on appeal, the issue of whether by virtue of having been granted *STN* standing, the Equity Committee now owned and possessed exclusive control over the litigation it had initiated. In accordance with the Consent Order, the Court did not decide that appeal on mootness grounds but rather on the merits. [103] Nowhere does the Consent Order's plain language suggest that every possible attack on the Plan the Equity Committee could raise on appeal would be insulated from the risks of equitable mootness.

Ignoring the provision's plain language, the Equity Committee reads it as requiring this Court to adjudicate the merits of each of its arguments. [104] Even if I found the provision ambiguous (which I do not), the Equity Committee's interpretation defies reason. Taken to its logical conclusion, the Equity Committee's argument is that this Court is precluded from considering the viability or equity of the relief the Equity Committee seeks. It directs the Court to turn a blind eye to the *Chateaugay* factors and to assume, without question, that a remedy exists and comports with Circuit law, no matter how fantastic or inequitable that remedy may be in reality. It is axiomatic that in "so ordering" the Consent Order, the Court did not intend to bind its own hands in this manner, nor did the Order have such an effect.

### E. The CVV's Governing Board Is Not Mired in an Unlawful Conflict of Interest

The Equity Committee argues that the Bankruptcy Court committed reversible error by "ignoring the intractable and unlawful conflict of interest created by the Plan's CVV governance provisions." [105] The Equity Committee bases this argument on its assumption that because a number of the CVV Trustees [106] have economic interests in the CVV that are aligned with creditor interests, they are

---

102. Consent Order ¶ 6 (emphasis added).

103. *See supra* Part II.B.

104. *See* Equity Reply Mem. at 3–7.

105. *Id.* at 21.

106. There are five CVV Trustees. Although the Equity Committee asserts that the Creditors' Committee hand-selected all five, *see* Eq-

uity Mem. at 40, Proponents maintain that the Trustees "were selected by certain creditors and not by the Creditors Committee." Proponents' Mem. at 35. In any event, it is undisputed that the CVV Trustees will retain the Creditors' Committee's current counsel to prosecute the Bank Litigation.

inherently unable to discharge their fiduciary duties to junior CVV interests, such as those belonging to equity holders. The only available solution, according to the Equity Committee, is to appoint "unconflicted professionals" to the CVV's governing board to represent equity holders' interests.[107]

The Equity Committee offers no evidence or citation to the record below that suggests the CVV Trustees will violate their fiduciary duties. The Equity Committee contends, however, that "no such evidence is required in the face of such a fundamental and blatant conflict of interest." [108] I disagree.

The Equity Committee relies on several cases and lawyers' codes of ethics for the proposition that a lawyer who represents two or more clients with potentially differing interests may not participate in effectuating an aggregate settlement of the clients' claims absent the clients' consent.[109] All of these citations are inapposite, because none addresses the propriety of a board of trustees managing a litigation trust in a post-confirmation chapter 11 bankruptcy proceeding. Pursuant to the Plan, the CVV Trustees owe a fiduciary duty to all holders of CVV interests to maximize the value of any litigation proceeds, including those arising from the Ad-

ditional Bank Claims.[110] The CVV Trustees are also liable for acts "undertaken with deliberate intent to injure the CVV Holders or with reckless disregard for the best interests of such CVV Holders." [111] As the Trustees work toward a resolution of the claims contained in the CVV, there will naturally be a point at which the interests of equity holders and creditors diverge because any proposed settlement—even if such settlement is the best result for the estates—will never be favorable to equity holders unless the proceeds are large enough to trickle down to their junior interests. Nevertheless, the Equity Committee's concerns are purely speculative. If and when there is a colorable claim that CVV Trustees have breached their fiduciary duties, they can be held accountable pursuant to the terms of the CVV Declaration.

Additionally, following the Equity Committee's argument to its logical conclusion would require the Plan to provide for the appointment of no fewer than thirteen CVV Trustees, one for each level of CVV Interests, and with each owing a singular fiduciary duty to its constituency. The cacophony of views that would result from such an unwieldy, potentially adversarial governing body would make it impossible for litigation decisions or strategies to

---

**107.** Equity Mem. at 40.

**108.** Equity Reply Mem. at 22 (citing *In re Saxon Indus., Inc.*, 29 B.R. 320, 321 (Bankr. S.D.N.Y.1983), in support of the proposition that "when it comes to the variant priorities and interests" of equity holders and creditors, the Code is careful to "prevent even the possibility of conflicts of interest").

**109.** *See* Equity Mem. at 40 (citing *Kittay v. Kornstein*, 230 F.3d 531, 538 (2d Cir.2000); *In re Saxon*, 29 B.R. at 321; *In re Proof of the Pudding, Inc.*, 3 B.R. 645 (Bankr.S.D.N.Y. 1980)). In *Kittay*, the court found that an attorney represented "differing interests" under the New York Code of Professional Re-

sponsibility because his clients were "competing for the same pot of money." 230 F.3d at 538. Although *Kittay* was a bankruptcy case, a nuanced yet important distinction must be drawn between the situation there versus the one here, in that here, the CVV arose from negotiations leading up to the Global Settlement. Thus, to the extent that CVV Interests can be said to be competing with each other, the arrangement is the result of a consensual effort to negotiate a final resolution to this bankruptcy.

**110.** *See* Section 9.4(a) of the Plan.

**111.** CVV Declaration §§ 5.02, 5.03.

emerge. The CVV's governing provisions were set forth in the Plan, which was solicited and approved by all classes, including an overwhelming majority of equity holders. There is nothing in the case law or the Code—and the Equity Committee cites nothing—that precludes classes of creditors from agreeing to entrust to the CVV Trustees, who were first identified at the Confirmation Hearing, whatever statutory rights they may have to any litigation proceeds.

## IV.  CONCLUSION

For the reasons stated above, the Equity Committee's appeal of the Confirmation Order is dismissed. The Clerk of Court is directed to close this appeal.

SO ORDERED.